**UNITED STATES of America**

v.

**Raymond J. PATRIARCA.**

**Cr. No. 89–289–MLW.**

United States District Court,
D. Massachusetts.

Dec. 1, 1995.

Jeffrey Auerhahn and James Herbert, Asst. U.S. Attys., Boston, MA, for U.S.

Martin Weinberg, Oteri, Weinberg & Lawson, Kimberly Homan, Sheketoff & Homan, Boston, MA, for defendant.

*MEMORANDUM AND ORDER*

WOLF, District Judge.

I. PROCEDURAL HISTORY AND SUMMARY

As described in detail in this court's decision concerning Raymond J. Patriarca's ini-

tial sentencing, the defendant has pled guilty to conspiring to violate, and violating, the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1962(c) and (d), and to several violations of the statute prohibiting interstate travel in aid of racketeering, 18 U.S.C. § 1952 (the "Travel Act"), which were also alleged to be RICO predicates. *See United States v. Patriarca,* 807 F.Supp. 165 (D.Mass.1992); *rev'd sub nom, United States v. Carrozza,* 4 F.3d 70 (1993) (hereinafter cited as *"Patriarca* 4 F.3d at ——"), *cert. denied,* —— U.S. ——, 114 S.Ct. 1644, 128 L.Ed.2d 365 (1994).

This court originally sentenced Patriarca to serve 97 months in prison. *Patriarca,* 807 F.Supp. at 209. In calculating the United States Sentencing Guidelines (the "Guidelines") for the defendant's RICO violation, the court held that his Base Offense Level should be computed on the basis of the underlying racketeering activities with which he was charged in the indictment and any relevant conduct relating to those charged predicate acts. *Id.* at 168, 188, 193. The court found that none of the seven crimes the government argued constituted relevant conduct met this standard. *Id.* at 168, 193. Thus, with an enhancement for Patriarca's role as the Boss of the Patriarca Family of La Cosa Nostra ("LCN"), defendant's Total Offense Level was 26, his Criminal History Category was I, and the Guidelines required a prison sentence of 63 to 78 months in the absence of a departure. *Id.* at 168.

With regard to the departure issues, the court found that the government had not proved by a preponderance of the evidence its contentions that Patriarca: knew about or authorized the killings of James Limoli and Ted Berns; conspired with, aided or abetted, or profited from the narcotics activities of his co-defendant Robert Carrozza; authorized an attempt to murder his co-defendant Vincent Ferrara; or participated in the harboring of LCN fugitive Alphonse Persico. *Id.* at 203–09. The court did, however, find that the government had adequately established for departure purposes one matter that the parties had not discussed at the numerous sentencing hearings—Patriarca's alleged involvement in the drug activities of Salvatore

Michael Caruana and the related claim that the defendant illegally assisted Caruana when he became a fugitive from federal drug charges. *Id.* at 205–06. Recognizing that the Caruana matter had received only cursory attention from the parties, and thus might have been misunderstood, the court stated that if, on appeal, Patriarca's relationship with Caruana was held to be potential relevant conduct, with the possibility of dramatically increasing the defendant's Base Offense Level, the court would consider further on remand whether to permit him to focus on and dispute the court's analysis of the Caruana matter. *Id.* at 205, n. 3.

The government and the defendant each appealed. Although they were germane to the issue of departure, independent of the question of relevant conduct, the government did not challenge this court's factual findings. *See Patriarca,* 4 F.3d at 73 ("The government acknowledges that Patriarca had direct personal involvement only in the Caruana drug trafficking and the harboring of Caruana as a fugitive."). The Court of Appeals for the First Circuit found, however, that the government was correct in its contention that this court "erred when it limited relevant conduct to conduct in furtherance of the RICO predicate acts charged against Patriarca." *Id.* at 74. Rather, the Court of Appeals held that:

> the term "underlying racketeering activity" in § 2E1.1(a)(2) means simply any act, whether or not charged against the defendant personally, that qualifies as a RICO predicate act under 18 U.S.C. § 1961(1) and is otherwise relevant conduct under § 1B1.3.

*Id.* at 77 (citation omitted).

As the Court of Appeals recognized, pursuant to § 1B1.3 a defendant is responsible for "acts of coconspirators [which] were in furtherance of the jointly undertaken activity and were reasonably foreseeable to the defendant." *Id.* at 83. It held that: "The seven acts proffered as relevant conduct must be reexamined in light of this standard." *Id.*[1]

---

1. In sentencing Patriarca, this court noted that

substantial constitutional questions would be

Among other things, Patriarca challenged on appeal this court's finding concerning his association with Caruana and decision to depart upward based on them. *Id.* at 83. The Court of Appeals, however, did not decide these challenges. *Id.* Rather, it stated that: "Because on remand the court will decide if the Caruana conspiracy is relevant conduct for RICO sentencing purposes, its utilization as a basis for upward departure need not be considered here and is vacated." *Id.*

The defendant asked the Supreme Court to hear this case before it was remanded for resentencing. His petition for certiorari was denied. *Patriarca,* —— U.S. at ——, 114 S.Ct. 1644 (1994).

Upon remand the government and the defendant agreed that three of the seven crimes originally alleged to be relevant conduct—the alleged harboring of Caruana and Persico as fugitives and the alleged authorization of an attempt to murder Vincent Ferrara—were not RICO predicate offenses under 18 U.S.C. § 1961(d) and, therefore, could not, under the First Circuit's ruling, constitute relevant conduct. *See Patriarca,* 4 F.3d at 76–7. Accordingly, the parties and the court prepared for hearings to address the four remaining matters alleged to be relevant conduct: the Limoli and Berns murders, Robert Carrozza's drug dealing, and Patriarca's relationship to Caruana's marijuana trafficking and attempt to extort Frank Lepere and Kevin Dailey.

As the hearings were about to begin, the government obtained the cooperation of Antonio Cucinotta, who was understood to be a member of the Patriarca Family and the defendant's driver from 1982 to 1988. For the reasons described in detail in a December 7, 1994 Memorandum and Order, the court decided that Cucinotta would be permitted to offer evidence on issues expressly included in the remand, but that the court would not reopen and relitigate facts it previously found which were not challenged by the government on appeal or allow the government to seek to prove at the resentencing any additional alleged instances of relevant conduct. *See also United States v. Bell,* 988 F.2d 247 (1st Cir.1993); *United States v. Rivera–Martinez,* 931 F.2d 148, 151 (1st Cir.) *cert. denied* 502 U.S. 862, 112 S.Ct. 184, 116 L.Ed.2d 145 (1991); *United States v. Wogan,* 972 F.2d 337 (1st Cir.1992) (unpublished disposition, 1992 WL 197368).[2]

Patriarca subsequently moved to withdraw his plea of guilty. The court has the discretion to permit a plea to be withdrawn for "any fair and just reason." Fed.R.Crim.P. 32(e). The defendant, in essence, asserted that the government had misled him by not putting him on notice prior to his plea that it would assert that uncharged murders and other matters which could dramatically affect

---

presented if an uncharged murder was proven at sentencing to be relevant conduct and raised the Guidelines for the defendant's sentence from 63 to 78 months to 65 years in prison. *Patriarca,* 807 F.Supp. at 193–95. The Court of Appeals for the First Circuit addressed this observation, stating:

> At least one member of the panel believes that serious constitutional concerns may arise if the defendant ultimately receives the equivalent of a life sentence on the ground of his connection with a murder for which he was never indicted, tried or convicted.

*Patriarca,* 4 F.3d at 81, n. 9. The Court of Appeals for the First Circuit, however, decided it was not appropriate to resolve this issue before this court resentenced Patriarca. *Id.*

Similarly, the Court of Appeals did not find it necessary or appropriate to decide certain other issues this court did not reach, including whether Due Process and the Confrontation Clause require additional procedures, such as a higher standard of proof than a preponderance of the evidence, in order to hold Patriarca responsible for the alleged relevant conduct in this case and whether Due Process required that the defendant be given notice before his plea of what the government alleged to be relevant conduct. *Id.* at 82. These issues too were remanded for consideration by this court if raised again by the defendant. *Id.* Although the defendant has not waived these arguments, he has represented that they may, as a practical matter, become moot as a result of this court's rulings regarding relevant conduct.

2. As the court explained, this decision should not, as a practical matter, permit Patriarca to escape punishment for any crime he may have committed. If the government believes Cucinotta can provide compelling evidence that Patriarca committed additional crimes, it can seek his punishment in the traditional manner of obtaining an indictment and proving, based upon admissible evidence, his guilt to a jury beyond a reasonable doubt. *See* December 7, 1994 Memorandum and Order at 3, 15–6.

the Guideline range for his sentence constitute relevant conduct. He relied, in part, on the observation by the Court of Appeals for the First Circuit that "sandbagging is never to be condoned." *United States v. Brewster,* 1 F.3d 51, 54 (1st Cir.1993). The government opposed this motion.

The defendant subsequently filed a motion to bar further sentencing proceedings on Double Jeopardy grounds. The government also opposed this motion.

Rather than address the pending motions immediately, the court asked the Probation Department to prepare an addendum to the Presentence Report to address the four remaining alleged instances of relevant conduct. The parties were given an opportunity to object to the Probation Department's findings and analysis. This is the standard procedure followed in virtually every case on sentencing and in many cases which are remanded for resentencing.

The Probation Department prepared an Addendum. The Probation Department proposed certain findings concerning relevant conduct and related issues which, if adopted by the court, would result in a Guideline range of 121 to 151 months imprisonment. *See* Addendum to Presentence Report of 1992, Revised Mar. 30, 1995.

The government objects to many of the findings of the Probation Department. The government asserts that the defendant's Total Offense Level is 43.[3] Consequently, the government contends that the court has no discretion and must impose the maximum possible sentence for the offenses to which the defendant has pled guilty, consecutive sentences totalling 65 years, because under the Guidelines Level 43 requires a sentence of life in prison.

The defendant also objects to the Probation Department's analysis and calculations. The defendant asserts that his Total Offense Level is, at most, 26 and his Criminal History Category is I. If this were true, the Guideline range for his incarceration would be 63 to 78 months. The defendant has now

served about 68 months. He requests that, in any event, he be given no more than the 97 month sentence he previously received.

In June 1995, the court denied the motion to dismiss based on double jeopardy grounds. *See* June 16, 1995 Transcript. The defendant decided not to appeal that decision prior to his resentencing.

The court was then informed that the defendant would not seek a ruling on his motion to withdraw his plea prior to his resentencing. He has not, however, withdrawn the motion.

Accordingly, the court again scheduled hearings relating to Patriarca's sentencing. The government represented that it would rely on the information contained in its proffers and submissions since September 1994, and did not seek to present the testimony of any witnesses. *See* June 9, 1995 letter from Assistant U.S. Attorney Jeffrey Auerhahn; Sept. 14, 1995 Transcript. The defendant also stated that he believed that the sentencing hearing could be conducted without testimony, but reserved the right to request it if the credibility of Cucinotta or other witnesses was deemed by the court to be critical to the determination of a fact which was dispositive of a question of relevant conduct. *See* June 9, 1995 letter from Martin Weinberg, Esq.; Sept. 14, 1995 Transcript. Patriarca also maintained his position that he would, among other things, be entitled to an opportunity to confront the witnesses against him if the court determined that certain events constituted relevant conduct and dramatically increased the Guideline range for his sentence. *Id.*

The court agreed to conduct the sentencing hearing on the basis of the parties' submissions, reserving the right to have one or more witnesses called if the court deemed it necessary to resolve an issue of credibility concerning a material fact. Sentencing hearings were held on September 22 and 27, 1995.

---

**3.** In 1992, the government asserted that the defendant's Total Offense Level was 39 because the Berns and Limoli murders were relevant conduct, but Patriarca was only a minimal participant in those crimes. The government now contends that because he was the Boss of the Patriarca Family, he should receive a four level enhancement for his role in those offenses.

Upon careful consideration of the voluminous evidence, the numerous memoranda, and the comprehensive arguments of counsel, the court finds, for the reasons described in detail in this Memorandum, that the government has proven by a preponderance of the evidence that two crimes constitute relevant conduct of Patriarca. These are: (1) the attempted extortion of Lepere and Dailey by Caruana in 1981, for which no adjustment for the defendant's role in the offense is appropriate (*see* § IV); and (2) William Grasso's crime, in 1986, of being an accessory after the fact to Caruana's murder of Berns, for which Patriarca is entitled to a four level reduction for his status as a "minimal" participant (*see* § VII). The government has not proven that any other crime constitutes relevant conduct.

In reaching these conclusions, as instructed by the Court of Appeals for the First Circuit, *Patriarca*, 4 F.3d at 76, this court has decided the scope of the joint criminal activity explicitly or implicitly agreed to by Patriarca jointly with others and whether certain criminal conduct was a reasonably foreseeable consequence of such activity. *See* § III, *infra*. With regard to these issues, the evidence demonstrates that during the period of the events alleged to be relevant conduct, from 1979 to 1986, direct drug dealing by members of the Patriarca Family was neither within the scope of the criminal activity that was explicitly or implicitly agreed to by Patriarca jointly with others, nor was it a reasonably foreseeable consequence of such criminal activity. Rather, such criminal conduct then violated the rules and prior practices of the Patriarca Family, and a reasonable person in Patriarca's position would not, at the relevant times, have been able to know in advance with a fair degree of certainty that members were, among other things, engaged in the possession of cocaine with intent to distribute it.

As also described in Section III, murder was a crime within the scope of defendant's joint agreement to undertake criminal activity. During the pertinent period, however, the rules of the Patriarca Family required that the Boss personally approve any murder proposed to be committed by a member. The defendant succeeded his father as Boss in 1984. At all times germane to the relevant conduct analysis, it was reasonable for Patriarca to believe that the rule regarding murder was being followed.

As described in Section IV, the government has not proved that Patriarca is responsible for the smuggling or distribution of marijuana by Caruana between 1979 and 1983. The electronic surveillance evidence which the court considered and misinterpreted at the original sentencing relates to Caruana's unsuccessful attempt to extort $1,000,000 from Lepere and Dailey. Caruana initiated the attempted extortion independently, without consulting Patriarca. Lepere and Dailey refused to pay Caruana and, at some point, threatened to blow-up Caruana's home and family. They also claimed to be protected by the Winter Hill Gang, which was associated with Gennaro Angiulo, the head of the Boston faction of the Patriarca Family. As a result, Caruana, who had a relationship primarily with the then ailing Raymond L.S. Patriarca, enlisted the defendant's assistance. Patriarca, among other things, participated in a meeting to promote the attempted extortion and to try to assure Caruana's safety. Although it has not been proven that Caruana or Patriarca obtained any money, this effort constituted a completed attempt to extort, which is a violation of 18 U.S.C. § 1956, and therefore, is not subject to a reduction in Offense Level under § 2X1.1. Neither an upward nor a downward adjustment for Patriarca's role in this offense is warranted.

As discussed in Section V, the government has not proven that Carrozza's possession of cocaine with intent to distribute it was within the scope of the criminal activity Patriarca agreed to undertake jointly or was a reasonably foreseeable consequence of such activity.

As described in Section VI, Limoli's murder in 1985 does not constitute relevant conduct. Limoli's murder was ordered by Ferrara because Limoli stole cocaine belonging to Antonio "Spucky" Spagnolo, another member of the Patriarca Family. Patriarca did not know of, or agree to, Spagnolo's violation of the Family's rule against members dealing drugs. Accordingly, Spagnolo's drug activity

was outside the scope of the joint criminal activity Patriarca agreed to undertake.

In addition, as in 1992, the court again is persuaded that Patriarca was not asked to authorize the Limoli murder and did not know about it. *See Patriarca*, 807 F.Supp. at 204. Thus, the killing of Limoli also violated the Patriarca Family rule prohibiting members from committing murder without the authorization of the Boss. The evidence indicates that in 1985, this violation was unprecedented. Therefore, in view of all of the relevant circumstances, it has not been shown that a reasonable person, knowing what Patriarca knew at the time, would have foreseen the murder of Limoli with a fair degree of certainty.

In these circumstances, the Limoli murder is not relevant conduct because, while it involved members of the Patriarca Family, it was not a crime committed in furtherance of joint criminal activity the defendant agreed to undertake and was not a reasonably foreseeable consequence of such activity.

As discussed in Section VII, the court finds that in 1986, Caruana was a fugitive from the marijuana charges pending against him in Boston. He was being harbored in Connecticut by the Patriarca Family. Grasso was the Family's link to Caruana.

On or about August 28, 1986, Caruana kidnapped and murdered Berns in a jealous rage generated by his belief that Berns was having an affair with Caruana's wife. The court once again finds that Patriarca did not authorize or know about Caruana's plan to murder Berns. *See Patriarca*, 807 F.Supp. at 206–7. That crime was not committed in furtherance of Patriarca's agreement to commit crimes jointly with Caruana. Nor was it a reasonably foreseeable consequence of any criminal activity within the scope of Patriarca's agreement with Caruana.

On August 31, 1986, Caruana told Grasso for the first time of Berns' murder and asked Grasso for assistance in burying the body. It is not proven that Grasso consulted Patriarca. Rather, acting on his own, Grasso arranged for Berns' burial on September 7, 1986.

Accordingly, Grasso was an accessory after the fact to Berns' murder. In committing this crime, Grasso was acting in furtherance of criminal activity he and Patriarca had jointly agreed to undertake—the harboring of Caruana as a fugitive. Although Patriarca did not know about or authorize Grasso's involvement in the burial of Berns, such assistance would have been foreseeable to a reasonable person in Patriarca's position. Thus, Patriarca is responsible at sentencing as an accessory after the fact. He is entitled, however, to a four level reduction in his Offense Level because of his "minimal" role.

As discussed in Section VIII, neither an upward nor a downward departure is justified in this case.

For the reasons described in Section IX, the defendant's Total Offense Level is 30 and his Criminal History Category is I. The Guideline Range for his imprisonment is, therefore, 97 to 121 months.

A final sentencing hearing will be held at 10:00 a.m. on December 26, 1995. The parties will be provided an opportunity to address where, within the Guideline range, sentence should be imposed. The defendant will be afforded an opportunity to speak. The defendant will then be sentenced.

## II. THE APPLICABLE STANDARDS

### A. *The Elements of Relevant Conduct*

Prior to addressing the discrete issues presented on remand, it is important to recognize the relevant questions and the standards by which they must be decided.

In its current form, § 1B1.3(a)(1)(B) provides, in part, that relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the [defendant's] jointly undertaken criminal activity, that occurred during the course of the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense ..." (1994).[4]

---

**4.** The original, 1987 Guidelines Manual applies to Patriarca's sentencing. However, all amendments to § 1B1.3 and the related Application Notes have been intended to "clarify" § 1B1.3

In remanding this matter for resentencing with regard to relevant conduct, the Court of Appeals for the First Circuit has stated that:

> On remand here ... the district court must determine (1) the scope of the joint criminal activity explicitly or implicitly agreed to by Patriarca jointly with others; (2) whether the criminal acts proffered as relevant conduct were in furtherance of this jointly undertaken criminal activity; and (3) whether the proffered acts were reasonably foreseeable in connection with that criminal activity. These determinations will fix the relevant conduct under § 1B1.3 for purposes of calculating the offense level under § 2E1.1. Such determinations are, of course, all inherently fact-bound.

*Patriarca,* 4 F.3d at 76.

■ Although the Court of Appeals for the First Circuit has not expressly decided this issue, *see United States v. Bianco,* 922 F.2d 910, 913, n. 2 (1st Cir.1991), its formulation of the relevant questions in this case indicates that a defendant's liability for sentencing purposes is the same as his liability for a substantive offense committed by a coconspirator under the principles described by the Supreme Court in *Pinkerton v. United States,* 328 U.S. 640, 646–48, 66 S.Ct. 1180, 1184–85, 90 L.Ed. 1489 (1946). *See United States v. Lanni,* 970 F.2d 1092, 1093, 1095 (2d Cir.1992); *United States v. Tisdale,* 952 F.2d 934, 938 (6th Cir.1992); *United States v. Martinez,* 987 F.2d 920, 925–26 (2d Cir.1993); *United States v. Perrone,* 936 F.2d 1403, 1416 (2d Cir.), *clarified on other grounds,* 949 F.2d 36 (2d Cir.1991); *United States v. Martinez,* 924 F.2d 209, 210, n. 1. (11th Cir. 1991); *United States v. Garcia,* 909 F.2d 1346, 1350, n. 1 (9th Cir.1990); *see also United States v. O'Campo,* 973 F.2d 1015, 1024, n. 7 (1st Cir.1992) ("The use of 'reasonable foreseeability' language in the Application Note ... is an apparent allusion to *Pinkerton* ");

*United States v. Garcia,* 954 F.2d 12, 15 (1st Cir.1992) (citing *Pinkerton,* in support of the proposition that: "In the context of a conspiracy, the proper inquiry in determining whether.... additional acts should be included as relevant conduct is whether those acts were reasonably foreseeable by the defendant and committed in furtherance of the conspiracy.").

In *Pinkerton,* the Supreme Court held that "the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." 328 U.S. at 643, 66 S.Ct. at 1182. The Court then went on to describe the circumstances in which a coconspirator could be held liable for the commission of a substantive offense in which he did not personally participate. It held that a defendant would be liable for such a substantive offense if it was committed by a coconspirator, in furtherance of the conspiracy, and was either within the scope of the unlawful project, or was part of the ramifications which could be reasonably foreseen as a necessary or natural consequence of the unlawful agreement. *Id.* at 647–48, 66 S.Ct. at 1184–85.

The operation of *Pinkerton* standards in the determination of relevant conduct means that " 'the scope of [relevant] conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy ...' " *Lanni,* 970 F.2d at 1093 (quoting *Perrone,* 936 F.2d at 1416). This is true because "[t]he broader aspect of conspiracy law, permitting conviction of a defendant who knew some but not all the aims of the conspiracy applies only to conviction for the conspiracy offense itself, and not to vicarious liability for substantive offenses committed by a co-conspirator." *Lanni,* 970 F.2d at 1095 (Newman, J., concurring) (citations omitted).[5]

rather than to change this provision substantively. *See United States v. LaCroix,* 28 F.3d 223, 227, n. 4 (1st Cir.1994). Thus, the clarifications may be utilized in this sentencing. *Id.* Accordingly, the references to § 1B1.3 in this Memorandum are to the United States Sentencing Commission Manual which incorporates the amendments effective November 1, 1994.

5. Some confusion concerning whether *Pinkerton* principles for determining liability for a substantive offense apply to deciding issues of relevant conduct has been generated because the Sentencing Commission evidently understood that the "reasonable foreseeability" requirement created a stricter test than *Pinkerton. See* William W. Wilkins & John R. Steer, *Relevant Conduct: The Cornerstone of the Federal Sentencing Guide-*

606

Consistent with this distinction between a defendant's liability for conspiracy and for a substantive offense, the Guidelines Manual has been clarified to explain explicitly that "the scope of the criminal activity jointly undertaken by the defendant (the 'jointly undertaken criminal activity') is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." § 1B1.3, Application Note 2. Rather, relevant conduct is defined as the conduct of others that was "*both* in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant ..." *Id.* (emphasis added).

■ As the Guidelines state, "the court must first determine the scope of the criminal activity [Patriarca] agreed to jointly undertake." *Id.* In this case, the Court of Appeals for the First Circuit has explained this requirement, stating, "[s]o as to keep the criminal responsibility within bounds, § 1B1.3 requires sentencing courts to ascertain *on an individual basis* the scope of the criminal activity that the particular defendant agreed jointly to undertake." *Patriarca*, 4 F.3d at 76 (emphasis added). Thus, the court must first determine "the scope of the criminal activity ... [Patriarca] agreed to jointly undertake (i.e. the scope of the *specific conduct* and *objectives* embraced by the defendant's agreement)." *Id.* (emphasis added); *see also United States v. LaCroix*, 28 F.3d at 227; *United States v. Studley*, 47 F.3d 569, 574 (2d Cir.1995).

■ In doing so, the "court may consider any 'explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.'" *Patriarca*, 4 F.3d at 76 (quoting § 1B1.3, Application Note 2). In view of the criminal nature of a RICO conspiracy, circumstantial evidence may be very important. However, it should be recognized that "a defendant's knowledge of an-

other participant's criminal act is not enough to hold the defendant responsible for those acts." *Studley*, 47 F.3d at 575; *see also United States v. Evbuomwan*, 992 F.2d 70, 74 (5th Cir.1993) ("mere knowledge that criminal activity is taking place is not enough"). "[A] relevant factor in determining whether activity is jointly undertaken is whether the participants pool their profits and resources, or whether they work independently." *Studley*, 47 F.3d at 575. The known past criminal conduct of an on-going conspiracy is also relevant to determining the scope of the future activity of the conspiracy the defendant has agreed to join. *O'Campo*, 973 F.2d at 1024–25 and n. 9.

The government in this case contends that the criminal activity jointly undertaken by the defendant includes all of the crimes committed by members, and associates, of the Patriarca Family. This argument is rooted, in part, in the statements by the Court of Appeals for the First Circuit that: (1) "relevant conduct in a RICO case includes all conduct reasonably foreseeable to the particular defendant in furtherance of the RICO enterprise to which he belongs;" and (2) "Here, the RICO enterprise—the Patriarca Family—was a 'jointly undertaken criminal activity.' Thus, Patriarca is *potentially* liable for the foreseeable criminal acts of others in furtherance of that enterprise even though he did not personally participate in them." *Patriarca*, 4 F.3d at 74–75 (emphasis added). However, read in the context of the rest of the opinion—including the specific, repeated direction that on remand this court first determine the scope of the criminal activity Patriarca agreed to jointly undertake—it is evident that these statements do not represent a decision by the Court of Appeals for the First Circuit concerning the scope of the joint criminal activity to which Patriarca agreed. Indeed, if the Court of Appeals had decided that the scope of the criminal activity

lines, 41 S.C.L.Rev 495, 510–13 (1990); *United States v. Joyner*, 924 F.2d 454, 458 (2d Cir.1991). However:

[I]f that was its view, it was mistaken. Under the most expansive doctrine of vicarious criminal responsibility, the *Pinkerton* doctrine, which holds a defendant liable for some sub-

stantive offenses committed by his co-conspirators, liability is imposed only if the substantive offense is "in furtherance of the conspiracy" and can be "reasonably foreseen as a necessary or natural consequence of the unlawful agreement."
*Joyner*, 924 F.2d at 458 (quoting, *Pinkerton*, 328 U.S. at 647–48, 66 S.Ct. at 1184–85).

to which Patriarca and others jointly agreed included all foreseeable criminal acts committed by members and associates of the Patriarca Family on its behalf, it would not have said that Patriarca was only "potentially" liable for them.

■ Nor is Patriarca's title as "Boss" of the Family for part of the period pertinent to his sentencing dispositive of this issue. It is the "scope of [the] participant's agreement—rather than his place in the hierarchy" that is crucial for sentencing purposes. *United States v. Lilly,* 13 F.3d 15, 18 (1st Cir.1994).

Accordingly, the court must first apply the foregoing principles to determine whether each alleged act of relevant conduct was within the scope of the defendant's jointly undertaken criminal activity.

The second question that the court must address is "whether the criminal acts proffered as relevant conduct were in furtherance of [Patriarca's] jointly undertaken criminal activity." *Patriarca,* 4 F.3d at 76. The meaning and import of the "in furtherance" requirement is not perfectly clear. *See* Paul J. Hofer, "Implications of the Relevant Conduct Study for the Revised Guidelines," 4 *Fed.Sent.R.* 334, 335 (1992) (discussing confusion of the terms "furtherance" and "scope"). The Courts of Appeals for the Second and Fifth Circuits have issued decisions suggesting that for an act to be in furtherance of the jointly undertaken criminal activity, the act must be within the scope of the joint criminal activity to which the defendant agreed. *See Studley,* 47 F.3d at 574 ("It is now plain from [the 1992 Amendment to Application Note 2] that in order to hold a defendant accountable for the acts of others, a district court must make two findings: 1) that the acts were within the scope of the defendant's agreement and 2) that they were foreseeable to the defendant."); *Evbuomwan,* 992 F.2d at 74 ("To hold a defendant accountable for the crime of a third person, the government must establish that the defendant agreed to jointly undertake criminal activities with the third person, and that the particular crime was within the scope of that agreement."). The defendant, in essence, asserts that this interpretation is correct.

The Court of Appeals for the First Circuit has stated that it rejects the view that to be relevant conduct "the accomplice's act would have to be 'in furtherance of activity within the scope of agreement.'" *LaCroix,* 28 F.3d at 227, n. 5. The First Circuit, however, adds that "application note 2, read as a whole, appears to use 'in furtherance' and 'within the scope' interchangeably—a practice consistent with earlier usage in both the commentary and the case law." *Id.* This court agrees with the government that this footnote is "obscure." *See* Sept. 22, 1995 Tr. at 34. However, the court believes that this footnote refers to the concept described in the 1992 amendment to Application Note 2 that:

> [T]he criminal activity that the defendant agreed to jointly undertake, and the reasonably foreseeable conduct of others in furtherance of that criminal activity, are not necessarily identical. For example, two defendants agree to commit a robbery and, during the course of that robbery, the first defendant assaults and injures a victim. The second defendant is accountable for the assault and injury to the victim (even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone) because the assaultive conduct was in furtherance of the jointly undertaken criminal activity (the robbery) and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).

This principle is consistent with the reasoning of the Court of Appeals for the First Circuit that members of a conspiracy to possess a large amount of marijuana may properly be held liable, under § 2D1.1(b)(1), for the possession of a firearm by a coconspirator, although they did not know of the firearm or agree to its being carried to the site of the sale. *Bianco,* 922 F.2d at 912–14. In *Bianco,* the Court of Appeals observed that firearms are common tools of the drug trade and the district court was not clearly erroneous in inferring, on the record before it, that when drugs were to be exchanged for a large amount of cash a coconspirator's possession of a firearm was foreseeable to the defendants. *Id.* at 912. The Court of Appeals

608

also emphasized, however, that when provided evidence placing the issue in dispute, a sentencing judge must consider more than just the nature of the offense and decide whether the government has proven "reasonable foreseeability." *Id.* at 912–13. Many other Circuits have employed the same reasoning as *Bianco* in drug cases in which a defendant did not know of his coconspirator's possession of a firearm. *See, e.g., United States v. Nichols,* 979 F.2d 402, 412–13 (6th Cir.1993); *United States v. Soto,* 959 F.2d 1181, 1186–87 (2d Cir.1992); *United States v. McFarlane,* 933 F.2d 898, 899 (10th Cir. 1991); *United States v. Barragan,* 915 F.2d 1174, 1177–79 (8th Cir.1990).

In view of the foregoing, the court understands that Patriarca is responsible at sentencing for the reasonably foreseeable crimes committed by his coconspirators for the purpose of promoting the success of criminal activity within the scope of his agreement with them. This does not, however, mean that he is punishable for every crime his coconspirators committed. For example, a crime may have been committed for the benefit of the coconspirator alone or on behalf of another conspiracy, rather than in furtherance of the conspiracy of which Patriarca was a part. *See, e.g., Pinkerton,* 328 U.S. at 647, 66 S.Ct. at 1184 (defendant would not be guilty of the substantive offense if "the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy"); *United States v. Banks,* 10 F.3d 1044, 1058 (4th Cir.1993) (although defendant reasonably could have foreseen distribution of the total amount of heroin attributed to the conspiracy, only the amount "with which he directly dealt could be found to have been distributed in furtherance of the specific, more limited activity he jointly undertook with others"); *United States v. Collado,* 975 F.2d 985, 991–95 (3rd Cir.1992). Moreover, a crime considered by the perpetrator to have been committed in his capacity as a member of the Patriarca Family might be beyond the scope of the criminal activity to which Patriarca agreed and not a reasonably foreseeable consequence of it. In the foregoing instances, Patriarca would not be subject to being sentenced based on the other person's criminal conduct.

■ To determine whether acts which were in furtherance of jointly undertaken criminal activity constitute relevant conduct, the court must decide if they "likely would have been foreseeable by a reasonable person in defendant's shoes at the time of his . . . agreement." *LaCroix,* 28 F.3d at 227. This is an objective test. " '[A] reasonably foreseeable act' [is] an act that a reasonable person who knew everything that the defendant knew *at the time* would have been able to know in advance with a fair degree of probability." *Id.* at 229 (emphasis added).

■ Foreseeability is measured from the time of the defendant's original agreement or, if proven, at the time he signals his agreement to expand the scope of his jointly undertaken criminal activity. *Id.* at 228. "[F]oreseeability may be established by . . . a defendant's knowledge of the nature and extent of a conspiracy in which he is involved." *Id.* at 229. Once again, however, it is important for the purposes of this case to recognize that foreseeability is a forward-looking concept. It is not appropriate to rely upon what the defendant learned about his coconspirators' activities only after the events alleged to be relevant conduct. Rather, the issue is whether, based on what he knew before the events, the defendant should have foreseen them with a "fair degree of certainty." *Id.*

B. *The Burden of Proof*

■ The burden of proving the essential elements of each alleged instance of relevant conduct is on the government. *United States v. Ocasio,* 914 F.2d 330, 332–33 (1st Cir.1990). As explained below, for the purposes of this sentencing, the court has assumed, without finding, that relevant conduct need only be proven by a preponderance of the evidence. This is the standard which typically applies to determining sentencing factors, including relevant conduct. *Patriarca,* 4 F.3d at 80; *United States v. Mena–Robles,* 4 F.3d 1026, 1035 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1550, 128 L.Ed.2d 199 (1994).

Patriarca, however, contends that where, as here, alleged relevant conduct has the potential to raise the sentence required by the Guidelines from less than seven years to 65 years, Due Process requires a higher standard of proof and additional procedural safeguards as well. Indeed, the defendant contends that since he faces the apparently unprecedented prospect of being sentenced to what is, in effect, life in prison for murders for which he has neither been charged nor convicted, Due Process requires that he be provided a trial by a jury, which should receive only information admissible under the Federal Rules of Evidence, and which should be required to decide whether he has been proven guilty beyond a reasonable doubt.

Several Courts of Appeals have recognized, without deciding, that Due Process may require at least proof by clear and convincing evidence where, as here, alleged relevant conduct has the potential to increase dramatically the defendant's sentence. *See United States v. Restrepo,* 946 F.2d 654, 661 (9th Cir.1991) (Tang, J. concurring) ("the severity of penal consequences associated with a sentencing factor may in some cases tip the balance toward requiring heightened procedural protections in determining the applicability of that factor"); *United States v. Townley,* 929 F.2d 365, 369 (8th Cir.1991) (a clear and convincing standard might apply where alleged relevant conduct would result in an "18–level increase in [the] base offense level and a seven-fold increase in the permissible sentencing range"); *United States v. Washington,* 11 F.3d 1510, 1516 (10th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1404, 128 L.Ed.2d 76 (1994) ("We recognize the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof."). In making these observations, the various Courts of Appeals have relied on the reasoning of *United States v. Kikumura,* 918 F.2d 1084, 1101 (3rd Cir.1990). In *Kikumura,* the maximum of the Guideline range for the offense of conviction was less than three years, but the sentencing judge departed to impose a sentence of 30 years. In these circumstances, Judge Edward Becker, then the Chair of the Judicial Conference Crimi-

nal Law Committee, held that Due Process required that the facts relied upon to enhance the sentence be proved by clear and convincing evidence. *Id.* at 1102.

The instant case presents a comparable example of a sentencing hearing that arguably functions as a " 'tail which wags the dog of the substantive offense' " and thus requires more than the usual standards and procedures to afford the defendant Due Process. *Kikumura,* 918 F.2d at 1103, (quoting *McMillan v. Pennsylvania,* 477 U.S. 79, 88, 106 S.Ct. 2411, 2417–18, 91 L.Ed.2d 67 (1986)). Here, the defendant pled guilty to RICO charges based on several Travel Act violations, with a maximum Guideline range of 78 months, and was not put on notice before he pled of the matters, including two murders, now purported to be relevant conduct, which if proven could require his incarceration for 65 years.

It is, however, not necessary or appropriate for this court to decide now whether Due Process in this case requires proof by more than a preponderance of the evidence because the government has, with two exceptions, failed to satisfy even that lower standard. *See Townley,* 929 F.2d at 370. The two instances of relevant conduct which have been proven do not enhance the defendant's sentence sufficiently to alter the usual requirements of Due Process. *See Restrepo,* 946 F.2d at 662 (Tang, J., concurring). Accordingly, defendant's claim that he will have been deprived of Due Process if given a dramatically increased sentence based on relevant conduct proven pursuant to the usual standards and procedures is, once again, left open. *See Patriarca,* 807 F.Supp. at 196; *Patriarca,* 4 F.3d at 82.

 While the court is employing the lower, preponderance of the evidence standard, it should be recognized that this "standard is a meaningful one that requires the judge to be convinced 'by a preponderance of the evidence that the fact in question exists.' " *Restrepo,* 946 F.2d at 661 (quoting *United States v. Streeter,* 907 F.2d 781, 792 (8th Cir.1990)). This test "is not without rigor." *United States v. Wise,* 976 F.2d 393,

402 (8th Cir.1992). As this court instructs civil juries:

> To "establish by a preponderance of the evidence" means to prove that something is more likely so than not so. In other words, a preponderance of the evidence means such evidence, as, when considered and compared with that opposed to it, has more convincing force, and produces the belief that what is sought to be proved is more likely true than not true.... The burden of proof has not been carried if, after considering all of the evidence, it is necessary to speculate, guess, or imagine that one or more of the necessary facts is true.

Thus, it is axiomatic that "it is a 'misinterpretation [of the preponderance test] that it calls on the trier of fact merely to perform an abstract weighing of the evidence in order to determine which side has produced the greater quantum, without regard to its effect in convincing his mind of the truth of the proposition asserted.' " *Restrepo*, 946 F.2d at 661 (quoting *In re Winship*, 397 U.S. 358, 367–68, 90 S.Ct. 1068, 1074–75, 25 L.Ed.2d 368 (1970)).

▬▬▬ Moreover, to be properly considered at all, "[i]nformation used as a basis for sentencing under the Guidelines must have 'sufficient indicia of reliability to support its probable accuracy.' " *United States v. Miele*, 989 F.2d 659, 663 (3rd Cir.1993) (quoting U.S.S.G. § 6A1.3(a)). This court has broad discretion to determine what information is, or is not, sufficiently dependable to be used in imposing sentence. *United States v. Tardiff*, 969 F.2d 1283, 1287 (1st Cir.1992). With regard to the four instances of alleged relevant conduct now at issue, the court has considered all of the evidence on which the government represented it wished to rely.[6] The court has also considered most of the evidence submitted by the defendant.[7] In retrospect, it appears that some of the government's evidence may lack sufficient indicia of reliability to have been properly considered at all. Nevertheless, the government has failed to prove by a preponderance of the evidence two of the four instances of alleged relevant conduct.

## III. THE SCOPE OF THE JOINT CRIMINAL ACTIVITY TO WHICH PATRIARCA AGREED

As stated earlier, in deciding whether any of the events at issue constitute relevant conduct with regard to Patriarca, the court must first determine the scope of the joint criminal activity explicitly or implicitly agreed to by him with others. *Patriarca*, 4 F.3d at 76. The events that the government contends are relevant conduct begin with Caruana's marijuana trafficking in 1979 and end with the killing of Berns in 1986. Thus, it is the scope of Patriarca's conspiratorial agreement in this period which is germane. *LaCroix*, 28 F.3d at 228. With regard to the scope of the joint criminal activity to which the defendant agreed, the court finds as follows.

At some point prior to 1979, the defendant became a member of the New England Family of the LCN named for his formidable father, Raymond L.S. Patriarca. The court infers that as his father's son and sometime messenger, the defendant knew well the scope and nature of the RICO enterprise that the Patriarca Family constituted during his father's tenure as Boss in the period from 1979 to 1984. This knowledge is material, circumstantial evidence of the scope of the joint criminal activity to which the defendant agreed. *O'Campo*, 973 F.2d at 1024–25 and n. 9.

---

6. As described earlier, the government informed the court that it wished to rely on its submissions since September 1994, including several boxes of transcripts of judicial proceedings, electronic surveillance, and other documents. *See* June 19, 1995 letter from Assistant U.S. Attorney Jeffrey Auerhahn; Sept. 14, 1995 Transcript. At the Sentencing hearing, the government confirmed that the record was complete. *See* Sept. 27, 1995 Tr. at 17.

7. Based on the government's objection that there was no opportunity for cross-examination, the court has not considered the affidavit of Dennis Lepore, and the two affidavits of Michael Bourbeau relating to Vincent Ferrara and Robert Carrozza, each of which describes Patriarca's lack of knowledge regarding drug activity. For similar reasons, the court has also not considered certain information regarding Patriarca's conduct concerning his former wife.

Until about the time of Raymond L.S. Patriarca's death in July 1984, the Patriarca Family operated in very much the manner described in the 1992 testimony of Philip Leonetti, the former Underboss of the Philadelphia Family of the LCN, and Special Agent James Maher of the Federal Bureau of Investigation, who based his expert testimony largely on a review of electronic surveillance conducted during the period in which the defendant's father was the Boss. *See Patriarca,* 807 F.Supp. at 203.

As Leonetti explained, in the pertinent period an LCN "Commission," based in New York, promulgated rules which LCN Families in the United States were expected to follow. LCN Families were supposed to operate in a hierarchical manner. Members were expected to "put on record" and get permission for all of their crimes, including, but not limited to, murder.

The criminal business of the Patriarca Family primarily involved illegal gambling, extortion, and engaging in extortionate credit transactions, commonly known as "loansharking." Murder was also a form of criminal activity engaged in by the Patriarca Family, and other LCN organizations, both before and after the defendant became a member. Indeed, RICO was enacted, in part, to address LCN conspiracies to murder. *See United States v. Angiulo,* 897 F.2d 1169, 1179–80 (1st Cir.1990); *Patriarca,* 807 F.Supp. at 198.

The government has not proven that the defendant ever personally participated in a murder, either before or after becoming a member of the LCN. Leonetti and Maher testified, however, that typically members would have to participate in a murder to be eligible for induction into the LCN. *See* May 18, 1992 Leonetti Tr. at 37; May 20, 1992 Maher Tr. at 6.

The evidence demonstrates that, during the pertinent period, members of the Patriarca Family pledged to kill on its behalf if authorized to do so by the Boss. For example, the government represents that Cucinotta would testify that "if he were asked to kill, he would have to kill." Government's Outline of Antonino Cucinotta's Anticipated Testimony ("Cucinotta Proffer") at 2 (Sept. 15, 1995). Special Agent Maher opined that an individual in the process of becoming a made member of the LCN is required to promise to kill on behalf of the Mafia if directed to do so by somebody with authority in that organization. May 20, 1992 Maher Tr. at 18. Consistent with this, Carmen Tortora and Richard Floramo each were asked at the electronically surveilled Mafia induction ceremony on October 29, 1989, if they would kill someone close to them if directed to do so. *See* Oct. 29, 1989 Tr. (Y–4/Q5 and Y–5/Q6). The court infers that the defendant took a similar oath, or at least knew of this requirement for Mafia membership in the period 1979 to 1986.

The rules promulgated by the LCN Commission required that the Boss personally approve any proposed murder. *See* May 18, 1992 Leonetti Tr. at 22–25. According to the rules, the Boss could not delegate the duty to approve a murder unless he was in jail. *Id.* at 23. Leonetti knew of no situation in which a Boss delegated authority to approve a murder when he was not incapacitated or incarcerated. *Id.* at 25. According to Leonetti, the penalty for a member of the LCN who killed without the Boss's permission could be death. *Id.* at 70.

As the government contends, Raymond L.S. Patriarca never delegated the authority to commit a murder to anyone else. More specifically, as the government has stated, although Gennaro Angiulo was given substantial authority for certain matters in Boston: "Evidence from the 1981 surveillances establishes that this delegation did not include ... the power to authorize murder. Instructions or permission to kill came from the Boss." Sept. 19, 1994, Government's Factual Submission Concerning the Scope of the Joint Criminal Activity Agreed to By Defendant Raymond Patriarca and the Foreseeability of Certain Acts" ("Government's Factual Submission") at 29.

In addition, there is no evidence, let alone proof, that during Raymond L.S. Patriarca's tenure as Boss any murder was committed on behalf of the Patriarca Family without his permission. To the contrary, Special Agent Maher testified that the transcripts of elec-

tronic surveillance he reviewed indicated that in 1983 the authorization of Raymond L.S. Patriarca was sought and received for Joseph Lamattina, who is also known as Joe Black, to commit a murder. *See* May 20, 1992 Maher Tr. at 87–88.

Raymond L.S. Patriarca died in July 1984. The defendant succeeded him as the Boss of the Patriarca Family. His selection resulted from nepotism rather than merit. *See Patriarca,* 807 F.Supp. at 171. As the court has described previously, in contrast to his father, the defendant was an ambivalent and weak Boss. *Id.* at 203; *United States v. Patriarca,* 776 F.Supp. 593, 601 (D.Mass. 1991). Indeed, he was not a full-time Boss. Rather, he spent some of his time managing the Kendall Construction Company and personally participating in developing property in Lincoln, Rhode Island. *Patriarca,* 776 F.Supp. at 600.

Nevertheless, the defendant never delegated to anyone else the power to approve murders on behalf of the Family. For example, as the government has stated, in 1989: "Patriarca delegated authority to [Joseph] Russo with the same restrictions that his father had delegated authority to Gennaro Angiulo . . . this delegation of authority did not include . . . the power to authorize murder." Government's Factual Submission at 29.

Nor did the defendant implicitly agree to permit murder on behalf of the Patriarca Family to be committed without his approval. There is no proof of an unauthorized murder relating to the Patriarca Family prior to the killing of Limoli in 1985. Thus, it cannot be said that Patriarca, as Boss, was wilfully blind to such conduct and, therefore, should be found to have tacitly agreed to a departure from the rule regarding murder which had been followed in practice during his father's tenure as Boss. *See, e.g., United States v. Brandon,* 17 F.3d 409, 451–52 and n. 72 (1st Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 80 and 115 S.Ct. 81, 130 L.Ed.2d 34 (1994) (in order to prove knowledge based on alleged "willful blindness," it must be shown that the defendant was aware of a high probability of the fact in question and deliberately

avoided learning the fact; mere negligence is not enough).

With regard to the issue of whether drug dealing by its members of the Patriarca Family was criminal activity within the scope of the defendant's joint agreement with them, this court found in 1992 that the defendant, while Boss, had a policy which implemented the LCN rule prohibiting drug dealing by its members. *Patriarca,* 807 F.Supp. at 183–84, 204. The court also found that the defendant did not know that Carrozza intended to use money extorted from Frank Mantia to purchase drugs. *Id.* at 182. In addition, the court concluded that Carrozza's planned drug transaction was not within the scope of Patriarca's Travel Act conspiracy with Carrozza, and was not a reasonably foreseeable consequence of it. *Id.* at 182–83.

On appeal, the government challenged this court's interpretation of the Guidelines. As indicated earlier, although the factual findings this court made at the initial sentencing concerning drugs were germane to departure issues, as well as to the question of relevant conduct, the government did not challenge those findings on appeal. *See, e.g., Patriarca,* 4 F.3d at 73.

 Nevertheless, pursuant to the decision reflected in the December 7, 1994 Memorandum and Order, the court has received additional evidence from Cucinotta, and other sources, concerning the matters alleged to be relevant conduct at the original sentencing. Based on all of the evidence concerning whether drug dealing by members of the Family was within the scope of the joint criminal activity agreed to by Patriarca, the court now finds again that it was not.

More specifically, at all times relevant to this sentencing, the LCN Commission had a rule prohibiting LCN Families and members from being involved with drugs. May 18, 1992 Leonetti Tr. at 26–27. Some Families took this rule very seriously. In 1985, members of the Gambino Family who dealt drugs risked death if the Boss found out. May 19, 1992 Leonetti Tr. at 7; *Patriarca,* 807 F.Supp. at 183.

Although there is some countervailing evidence, the record also clearly establishes that

when Raymond L.S. Patriarca was Boss, members of the Family were prohibited from directly dealing drugs and this rule continued during the defendant's tenure. Thus, the defendant did not explicitly agree to engage jointly with other members of the Patriarca Family in crimes involving the possession of controlled substances by those members with intent to distribute them. Such crimes were not within the scope of the defendant's explicit conspiratorial agreement. As set forth below, the defendant also did not tacitly enter into any agreement to jointly undertake such crimes. The evidence which establishes this limitation on the scope of the defendant's conspiratorial agreement includes the following.

The government agrees that there was a rule which prohibited members of the Patriarca Family from getting directly involved in drug deals or personally dealing drugs. *See* Government's Factual Submission at 41, n. 64; Sept. 30, 1994 Government's Response to Defendant's Memorandum Concerning Relevant Conduct at 13. Special Agent Joseph Hannigan of the Federal Bureau of Investigation testified before this court in another case involving members of the Patriarca Family that he was advised that the Boss had stated that members were not to traffic in narcotics. *United States v. DiGiacomo,* (Cr. No. 90–10065–WF), June 25, 1990 Hannigan Tr. at 79. Similarly, Special Agent Maher testified in this case that in his opinion members of the Patriarca Family were prohibited from involvement in narcotics trafficking, but that it was permissible for associates of those members to do so and members could profit from their associates' drug activities. *See* May 20, 1992 Maher Tr. at 99.

The government represents that Cucinotta would testify that "[t]he rule in the Family was that members were not supposed to deal drugs." Cucinotta Proffer at 3. Thomas Hillary, an associate of the Patriarca Family who at one time lived in Raymond L.S. Patriarca's home, testified to the grand jury that there was at all relevant times a rule prohibiting members from being involved in drugs. *See* Defendant's Second Supplemental Exhibit List, Ex. II(A) (Hillary Tr. at 65–

66). Moreover, disputing Maher's opinion regarding whether associates were permitted to traffic in narcotics, Hillary testified that he could not be directly involved with drugs, nor could anyone under him. *Id.* Hillary understood that members of the Patriarca Family would be killed if caught violating this rule. *Id.* Similarly, John Demarco has stated that Carrozza told him that Carrozza was not allowed to be directly involved with drug dealing. May 1992 Affidavit of John Demarco at ¶ 8. Indeed, at the October 29, 1989 electronically surveilled induction ceremony, Patriarca and Russo told new members that drug dealing was not permitted. *See* Oct. 29, 1989 Tr. (Y–5/Q–6) at 32.

The court's conclusion that members of the Patriarca Family were prohibited from personally participating in drug crimes, including possessing drugs with intent to distribute or conspiring to do so, is not altered by any of the countervailing evidence. The court recognizes that in an electronically surveilled conversation Angiulo, while describing the activities of the Patriarca Family, stated: "We sell marijuana." Apr. 27, 1981 Tr. (658(ii)) at 5. Angiulo, however, did not ascribe this activity to members of the Family, as opposed to associates. Moreover, in another electronically surveilled conversation Angiulo said: "We don't say guys are with us that are dealing in junk." Mar. 10, 1981 Tr. (304(i)) at 2. Furthermore, Angiulo did not in any intercepted conversation say or suggest that members of the Patriarca Family trafficked in cocaine, which is the controlled substance involved in the Carrozza and Limoli matters alleged to be relevant conduct.

The government represents that Cucinotta would testify that a number of members were involved with making money from drug dealers and at least one abused drugs. Cucinotta Proffer at 3. If true, Cucinotta's claim that members profited from activities of drug dealers is consistent with loansharking and extortion—two of the crimes customarily committed by members of the Patriarca Family. The Cucinotta Proffer does not include a claim that any member of the Patriarca Family was personally involved in drug distribution, except for Caruana, who he says was inducted in approximately 1981.

As described *infra*, the court finds that Cucinotta is incorrect at least regarding when Caruana was made a member of the Patriarca Family, and may be unreliable on the question of whether Caruana was ever inducted at all.

Thus, the evidence persuades the court that during the period relevant to this sentencing the Patriarca Family had a rule prohibiting members from possessing controlled substances with intent to distribute them, or conspiring to do so. This rule was interpreted by some members to permit them to profit from the distribution of controlled substances by others, by lending money to drug traffickers at usurious rates as part of their loansharking activities, or by extorting money for protection from drug dealers, as they had long extracted "rent" from bookmakers. Patriarca, however, did not explicitly agree with members of the Family to engage jointly in the possession of controlled substances, particularly cocaine, with intent to distribute. Nor did he tacitly agree to do so.

More specifically, in retrospect it is now evident that in 1985 Carrozza was violating the Patriarca Family rule regarding drugs. *See Patriarca*, 807 F.Supp. at 182–84. As discussed *infra*, it is also clear that in 1985, Spagnolo was engaging in prohibited conduct and that his possession of cocaine with intent to distribute it led to the killing of Limoli. *Id.* at 204. The defendant, however, did not know about, or tacitly agree to, the crimes concerning cocaine committed by Carrozza, Spagnolo, or others.

Beginning in about 1983, when Angiulo was arrested, the operation of the Patriarca Family was disrupted. *Id.* at 203; *Patriarca*, 776 F.Supp. at 601–02. Hillary testified that with regard to drugs, some members "snuck around" and violated the prohibition on drug dealing. *See* Defendant's Second Supplemental Exhibit List, Ex. II(A) (Hillary Tr. at 65). Some members of the Boston faction of the Family, including Ferrara, Carrozza, Spagnolo and Dennis Lepore, successfully sought to keep many of their activities secret from the defendant. This is exemplified by the 1987 extortion of $250,000 from his father's friends, the bookmakers Sagansky and Weinstein. *See* Patriarca, 807 F.Supp. at 173, 200. Carrozza and Spagnolo, among others, also concealed their drug dealing from the defendant. They did not share their often meager drug profits with Patriarca, either directly or indirectly. *See Patriarca*, 807 F.Supp. at 173, 200. Indeed, it is represented that Cucinotta, who was the defendant's driver from about 1982 to 1988, knows of no payments made by anyone in Boston to Patriarca. *See* Defendant's Second Supplemental Exhibit List, Ex. IV(A) (June 30, 1995 letter from Assistant U.S. Attorney Jeffrey Auerhahn).

When he succeeded his father as Boss in 1984, the defendant evidently complacently assumed that the past would be prologue and that the Family would continue to follow the rule regarding drugs, among others. It now appears that with the leadership in Boston in disarray, some members violated this rule. The defendant did not, however, know about these violations or recklessly disregard them. *See Brandon*, 17 F.3d at 451–52 and n. 72. Therefore, he did not knowingly acquiesce in them, or otherwise tacitly agree to expand the scope of the criminal activity he agreed to undertake jointly to include the possession by members of the Family of cocaine or marijuana with intent to distribute, or comparable drug crimes.

IV. CARUANA'S MARIJUANA SMUGGLING AND EXTORTION

At the initial sentencing, this court found that Patriarca was involved in some drug crimes committed by Caruana between 1981 and 1983, and departed upward on the basis of them. *Patriarca*, 807 F.Supp. at 170, 205. This decision rested almost exclusively on the court's acceptance of the government's essentially undisputed interpretation of the electronic surveillance of Angiulo's headquarters at 98 Prince Street. *Id.* at 205–06. As indicated earlier, the issue of Patriarca's involvement with Caruana, and the related evidence had not been addressed by the parties or the court at the many hearings before the sentencing. In view of the value of concluding the protracted initial sentencing, and because the court then believed that the issue of the defendant's connection with Caruana's marijuana activity related only to the question of a limited upward departure, the court decid-

ed the matter without the benefit of any evidence from the defendant or argument by the parties. *Id.* The court stated, however, that if Patriarca's involvement in Caruana's drug crimes was, as a matter of law, determined on appeal to constitute possible relevant conduct of Patriarca, which could dramatically increase his Base Offense Level and resulting Guidelines, the court might afford him the opportunity to relitigate the court's factual findings. *Id.* at 205, n. 3.

On appeal, the defendant challenged this court's finding that between 1981 and 1983 Patriarca was involved with Caruana's drug crimes. *Patriarca,* 4 F.3d at 83. The Court of Appeals, however, did not decide this question. Rather, it held that "[b]ecause on remand the court will decide if the Caruana conspiracy is relevant conduct for RICO sentencing purposes, its utilization as a basis for upward departure need not be considered here, and is vacated." *Id.*

On remand, the parties have provided extensive analysis and argument concerning the implications of the electronic surveillance and other evidence regarding Patriarca's relationship with Caruana. Upon careful, further consideration of the evidence and arguments, the court understands that it originally misinterpreted the meaning and implications of the electronic surveillance which remains at the heart of the evidence on the issue of whether the government has proven that Patriarca is legally responsible at sentencing for any smuggling or distribution of marijuana by Caruana. The court now concludes that the government has not satisfied its burden of proof on this issue. The court finds, however, that it has been proven by a preponderance of the evidence that the defendant aided and abetted an unsuccessful attempt by Caruana to extort Frank Lepere and Kevin Dailey. This crime constitutes relevant conduct for the purpose of Patriarca's sentencing.

### A. *Marijuana*

█ With regard to Caruana, the defendant contends that the court should not rely at all on the electronic surveillance of Angiulo and others because it lacks "sufficient indicia of reliability." *See* U.S.S.G. § 6A1.3(a); *Tardiff,* 969 F.2d at 1287; *Miele,* 989 F.2d at 663. While the court finds that it is inappropriate to exclude the electronic surveillance evidence, careful examination persuades the court that this evidence suffers from many weaknesses which the court did not appreciate at the initial sentencing.

Weighing most heavily in favor of the reliability of the information provided by the electronic surveillance is the fact that the speakers did not know they were being recorded and, therefore, appear to have been speaking candidly. Pertinent parts of the electronic surveillance, however, are unintelligible and certain comments are ambiguous in material respects.

More importantly, with regard to the question whether Patriarca engaged in marijuana smuggling or trafficking with Caruana, it is now clear that Angiulo and Zannino, the principle intercepted speakers, entirely lack personal knowledge. *Compare United States v. Aymelek,* 926 F.2d 64, 68 (1st Cir. 1991) (evidence sufficiently reliable at sentencing in part because defendant produced no evidence that affiant lacked personal knowledge). In view of the Family rule against members dealing in drugs, or conspiring to do so, if Patriarca had been participating in Caruana's marijuana activity, the court infers that he would have done so secretively. In any event, the pertinent transcripts indicate that Angiulo and Zannino were merely speculating on this issue.

In addition, the probative value of the electronically surveilled statements is diminished because they were not made under oath. *Compare United States v. Williams,* 10 F.3d 910, 913 (1st Cir.1993). Nor were they subject to cross-examination. *Compare United States v. Corbin,* 998 F.2d 1377, 1387, n. 17 (7th Cir.1993).

█ It is unclear whether all of the electronically surveilled discussions would, if challenged, be admissible under Federal Rule of Evidence 801(d)(2)(E) as statements of coconspirators in furtherance of the conspiracy; some of them are only gossip. Their admissibility at a trial, however, is not dispositive of the question whether the statements may be considered at sentencing,

where the court is permitted to utilize reliable hearsay. *See United States v. Skrodzki,* 9 F.3d 198, 201 (1st Cir.1993). With regard to whether Patriarca participated in marijuana smuggling or distribution of marijuana with Caruana, however, there is no corroboration for the speculative ruminations of Angiulo and Zannino. For example, as indicated earlier, Cucinotta has no knowledge of any payments being made by Caruana to Patriarca. *See* Defendant's Second Supplemental Exhibit List, Ex. IV(A) (June 30, 1995 letter from Assistant U.S. Attorney Jeffrey Auerhahn at 2). Nor has the government claimed that any of its many confidential informants has personal knowledge, or other reliable information, that Patriarca engaged in marijuana trafficking with Caruana. In similar circumstances, it has been found that district courts have erred because they sentenced defendants based on unreliable information. *See e.g., United States v. Cammisano,* 917 F.2d 1057, 1062 (8th Cir.1990); *Townley,* 929 F.2d at 371; *Miele,* 989 F.2d at 664; *United States v. Simmons,* 964 F.2d 763, 776 (8th Cir.), *cert. denied,* 506 U.S. 1011, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992).

Nevertheless, the court has considered the electronic surveillance evidence on the question whether the government has proven that Patriarca conspired with Caruana to import or distribute marijuana, or is otherwise criminally responsible for those crimes. As indicated earlier, this has not been proven.

More specifically, in 1983 Caruana was charged with smuggling about 156,000 pounds of marijuana in 1979, and 800 pounds of marijuana in 1983. *See United States v. Caruana,* (Cr. No. 83–309–Z), Indictment. The government contends that because Caruana fled, it should be inferred that he was guilty of those charges. The government also asserts that Caruana was by 1981 a member of the Patriarca Family, under Raymond L.S. Patriarca and the defendant, and that the defendant is, therefore, now responsible at sentencing for the full amount of marijuana with which Caruana was charged.

As described earlier, the government relies almost exclusively on the electronic surveillance of 98 Prince Street to prove that Caruana's marijuana activity is relevant conduct of Patriarca. That electronic surveillance begins in 1981 and depicts Angiulo trying to discern Caruana's activities, and his relationship to the defendant and the Patriarca Family. There is no evidence, let alone a preponderance of the evidence, from which it can be inferred that the defendant and Caruana were associated in the 1979 marijuana smuggles for which Caruana was indicted. Thus, even if it were demonstrated that Caruana and Patriarca had become coconspirators by 1981, the defendant would not be responsible for the 156,000 pounds of marijuana allegedly smuggled by Caruana in 1979. *See O'Campo,* 973 F.2d at 1025–1026 ("a new entrant cannot have his base offense level enhanced at sentencing for drug distributions made prior to his entrance merely because he knew they took place"); *United States v. Carreon,* 11 F.3d 1225, 1235–36 (5th Cir.1994); *Collado,* 975 F.2d at 997.

It has not, however, been proven that any marijuana smuggling or distribution by Caruana in 1981 or after constitutes relevant conduct of the defendant. Rather, the evidence indicates that Caruana "belonged to" defendant's father, Raymond L.S. Patriarca. *See* Mar. 10, 1981 Tr. (304i) at 4, 9. As a result of this association, the defendant also had a relationship with Caruana.

The government represents that Cucinotta would testify that Caruana was made a member of the Patriarca Family in approximately 1981. Cucinotta Proffer at 2. The court finds, however, that Caruana was not a member of the Family at the time of the 1981 electronic surveillance. At that time the Family had both a policy and practice of prohibiting members from dealing drugs, which was Caruana's criminal occupation. The discussion of Caruana in the electronic surveillance does not refer to him as a member of the Patriarca Family, or as an exception to the rule prohibiting members from dealing drugs. Moreover, if Caruana had been a member of the Family, he would not have had the fear of visiting Angiulo at 98 Prince Street which, as discussed below in connection with the attempted extortion of Lepere and Dailey, influenced the defendant to intercede on Caruana's behalf.

■ In and after 1981, the defendant knew that Caruana smuggled and sold marijuana. The court also assumes, without finding, that as the government represents, Cucinotta would testify that Caruana once showed the defendant a planeload of marijuana. Cucinotta Proffer at 2–3. However, proving that a defendant " 'knew what was going on' is not sufficient to establish coconspirator criminal liability." *O'Campo,* 973 F.2d at 1025; *see also United States v. Ocampo,* 964 F.2d 80, 82 (1st Cir.1992) ("defendant knew what was going on, but that is not enough to establish intent to conspire"); *Studley,* 47 F.3d at 574; *Evbuomwan,* 992 F.2d at 74.[8]

As described earlier, "a relevant factor in determining whether activity is jointly undertaken is whether the participants pool their profits and resources . . ." *Studley,* 47 F.3d at 575. As also noted earlier, despite being the defendant's driver, Cucinotta knows of no payments made by Caruana to Patriarca. *See* Defendant's Second Supplemental Exhibit List, Ex. IV(A) (June 30, 1995 letter from Assistant U.S. Attorney Jeffrey Auerhahn at 2).

In one electronically surveilled conversation, Angiulo does say: "Sure Junior [the defendant] thinks the world of [Caruana]. He's got 333,000 bucks. That's why he thinks the world of him." Feb. 14, 1981 Tr. (190) at 6. Upon inspection, however, it is evident that Angiulo is merely speculating on whether Patriarca was paid any significant sum by Caruana. In the same conversation, Angiulo notes that the individuals involved deny this; rather he reports, "the guys in Providence said they took down five thousand a week and split." *Id.* at 1. Nevertheless, Angiulo believes that $1,000,000 was split. *Id.* However, the basis for his belief is not explained. Nor is any payment to the defendant, whatever the amount, attributed by Angiulo to marijuana smuggling or distribution by Caruana. In essence, upon analysis, the 1981 electronic surveillance evidence merely indicates that Angiulo thought that Caruana was paying the defendant for something, but he did not know if this was true.

Similarly, in 1983 Zannino was intercepted saying that George Katter told Howie Brower to tell the defendant that he was going to get indicted with Caruana. *See* Aug. 25, 1983 Tr. (Tape No. 5A) at 1. This information is merely "hearsay upon hearsay upon hearsay." *Cammisano,* 917 F.2d at 1062 (citation omitted). In this case, as in *Cammisano,* it is not reliable evidence. *Id.* Although 17 other individuals were charged with Caruana, the defendant was not indicted. *See United States v. Caruana,* (Cr. No. 83–309–Z), Indictment. Nor was Caruana charged with conducting his alleged marijuana crimes on behalf of the Patriarca Family. Rather, it was charged that Caruana himself was the organizer and supervisor of a separate and distinct continuing criminal enterprise. *Id.* In comparable circumstances, the Court of Appeals for the Eighth Circuit reversed a finding of relevant conduct, stating that:

> [W]e note that the Government elected not to charge this case as a conspiracy. Although not dispositive, we pause to question whether the Government itself believed that it possessed probable cause to charge joint criminal activity, much less a preponderance of proof.

*Townley,* 929 F.2d at 370.

In any event, there is insufficient corroboration for the foregoing hearsay to be sufficiently reliable to contribute to a finding that it has been shown by a preponderance of the evidence that any of Caruana's marijuana activity constitutes relevant conduct of Patriarca. Once again, there is no electronic surveillance or any confidential informant claiming to have personal knowledge who provides information damaging to the defendant on this issue.

Similarly, the August 30, 1983 electronic surveillance of Zannino does not, either alone or in conjunction with the other evidence, prove Patriarca's complicity in Caruana's marijuana crimes. Rather, that intercepted conversation indicates that a member or as-

---

8. Because the credibility of the contention that Caruana showed Patriarca a planeload of marijuana is not critical to the court's decision concerning whether Caruana's marijuana activity is relevant conduct, the court has chosen not to take testimony from Cucinotta on this issue.

sociate of the Patriarca Family engaged in loansharking lent $15,000 to someone to finance the importation of marijuana. *See* Aug. 30, 1983 Tr. (Tape No. 6A) at 1. However, the shipment was stolen by some "kids." *Id.* at 2. The victim was someone who had done Caruana many favors and owed him money. *Id.* Claiming that the defendant suggested he speak to Zannino, Caruana asked Zannino to help get the marijuana back so the loansharking debt could be repaid. *Id.* Zannino did so. *Id.* This transaction neither involved the importation or distribution of marijuana by Caruana nor contributes to proving that the defendant participated in such activity.

Finally, there is no evidence, let alone the required proof, of any amount of marijuana which could be properly attributed to Patriarca if some of Caruana's smuggling or distribution were proven to be relevant conduct. If, contrary to the court's conclusion, some of Caruana's marijuana smuggling or distribution was proven to be relevant conduct of Patriarca, the government would have to prove by a preponderance of the evidence the amount of drugs properly attributable to Patriarca. *See United States v. Sepulveda,* 15 F.3d 1161, 1198 (1st Cir.1993) *cert. denied* — U.S. —, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994). As the Court of Appeals for the First Circuit has explained:

Courts must sedulously enforce that quantum-of-proof rule, for, under the guidelines, drug quantity has a dramatic leveraging effect. Thus, relatively small quantitative differences may produce markedly different periods of immurement. This reality informs the preponderance standard, requiring that district courts must base their findings on "reliable information" and, where uncertainty reigns, must "err on the side of caution." (citations omitted).

*Id.; see also Lanni,* 970 F.2d at 1093 (remanded for specific findings of drug amounts reasonably foreseeable by each coconspirator). *Collado,* 975 F.2d at 995 (remanded for specific findings concerning scope of each coconspirator's agreement).

In this case, the government contends that Patriarca was the Boss, Caruana was a subordinate in the Family who acted only with Patriarca's permission, and that Patriarca is, therefore, now responsible at sentencing for the full amount of marijuana attributable to Caruana. This hypothesis was not alleged in the Caruana case and is not proven now. Thus, on the voluminous record before the court, the government has not established that Caruana's marijuana activity is relevant conduct of the defendant or the amount of any marijuana for which Patriarca could properly be held liable if such relevant conduct were proved.[9]

9. At the September 27, 1995 hearing, after the court questioned whether the government's evidence was sufficient to prove that any of Caruana's marijuana crimes constituted relevant conduct of the defendant, the government asked the court to consider information from Robert Frappier and Robert Deutsch that it had proffered in connection with the defendant's 1992 sentencing. *See* Sept. 27, 1995 Tr. at 34–36. The defendant objected because that information was not included in the several boxes of materials the government had represented it would rely on at this resentencing. *Id.* at 35. The defendant also stated he would want to introduce a great deal more material to impeach Frappier and Deutsch if the court intended to rely on information they provided. *Id.*

The defendant is correct that the government did not include information from Frappier and Deutsch in the many memoranda and boxes of exhibits it has submitted since September 1994. In June 1995 the government represented it would rely exclusively on those materials at the resentencing. *See* June 9, 1995 letter from Assis-

tant U.S. Attorney Jeffrey Auerhahn. Indeed, earlier on September 27, 1995, the government confirmed that it made a decision as to what information to rely upon and the record was complete. *See* Sept. 27, 1995 Tr. at 17.

Nevertheless, the court has analyzed the 1992 proffer concerning Frappier and Deutsch. *See* March 13, 1992 Government's Proffer of Evidence Concerning Sentencing Hearing at 21–23. The proffer indicates that Frappier would testify that Caruana said he was connected to Raymond L.S. Patriarca, but makes no mention of the defendant. With regard to Deutsch, the proffer represents he would state that Joseph Balliro, Esq. told him that the defendant did a lot of business with Caruana, running drugs to the United States. The court understands that Deutsch testified in the government's criminal case against Balliro, which resulted in the entry of a judgment of acquittal pursuant to Fed. R.Crim.P. 29. It is not claimed that Deutsch has any personal knowledge of the defendant's alleged association with Caruana. His information would be hearsay and evidently would be

## B. *Extortion*

 As indicated earlier, the government has proven by a preponderance of the evidence that the defendant aided and abetted an unsuccessful attempt by Caruana to extort $1,000,000 from Frank Lepere and Kevin Dailey, two competing marijuana distributors. The 1981 electronic surveillance of 98 Prince Street constitutes virtually all of the evidence concerning this matter. Pertinent parts of the intercepted conversations are, once again, unintelligible or ambiguous. Nevertheless, the intercepted conversations have indicia of reliability concerning the attempted extortion of Lepere and Dailey which is lacking with regard to the purported, but unproven, involvement of Patriarca in Caruana's marijuana crimes. For example, Angiulo spoke to both the defendant and Caruana. Thus, he had personal knowledge of what they each claimed to have done. In addition, the Cucinotta Proffer provides some valuable corroboration.

As described earlier, in late 1980 and 1981, Caruana was not a member of the Patriarca Family. He was, however, "with" Raymond L.S. Patriarca, who was then ill. In this period, the defendant served as a reluctant messenger for his father. *See Patriarca,* 807 F.Supp. at 171. He also had some dealings with Caruana on his own behalf.

In late 1980 or early 1981, Caruana attempted to obtain $1,000,000 from Lepere and Dailey, marijuana traffickers who Caruana claimed had used his planes and pilots and, therefore, should pay him. In his effort to obtain this money, Caruana invoked the name of Raymond L.S. Patriarca. It is not, however, proven that Caruana consulted either Raymond L.S. Patriarca or the defendant before initiating his attempt to extort Lepere and Dailey. Rather, the direct and circumstantial evidence indicates that he did not. For example, in March 1981, Caruana admitted to Angiulo that he had not seen Raymond L.S. Patriarca for "a long time." *See* Mar. 10, 1981 Tr. (304(i)) at 7.

Lepere and Dailey refused to accede to Caruana's demand. Rather, they told Caruana that they were associated with, and had the protection of, James "Whitey" Bulger and Stephen Flemmi. In another case pending before this court it is alleged that Bulger and Flemmi were leaders of the Winter Hill Gang, which coordinated its activities in Boston with the LCN, and at times cooperated with Angiulo and his successors. *See United States v. Robert DeLuca,* (Cr. No. 94–10287–MLW), Superseding Indictment. Indeed, it is charged that in the period including 1980 and 1981, the Winter Hill Gang and the LCN operated together as a RICO enterprise. *Id.* In any event, Lepere and Dailey not only refused to pay Caruana, at some point they threatened to blow-up his home and family. *See* Mar. 10, 1981 Tr. (304(i)) at 7–8.

As a result of the response of Lepere and Dailey to his demand, Caruana hoped to obtain the assistance of the Patriarca Family in his extortion attempt, and its protection from the danger he perceived from Bulger, Flemmi, and Angiulo. Thus, he contacted Raymond L.S. Patriarca and the defendant to request assistance and protection.

The defendant evidently did not feel that this was a matter he could handle himself. Accordingly, Patriarca asked Angiulo if he could bring Caruana to see him, and sought assurance that Caruana would not be harmed if he came to 98 Prince Street. *See* Feb. 2, 1981 Tr. (96) at 2.

Angiulo agreed to meet with Caruana. He believed that Caruana had been making payments to Raymond L.S. Patriarca and the defendant, and that the defendant was now turning Caruana over to him. Angiulo perceived a chance to get part of any money Caruana might obtain from Lepere and Dailey. *See* Mar. 10, 1981 Tr. (304(i)) at 3. He

---

subject to serious impeachment. The government did not propose to present evidence from Balliro.

In view of all of the foregoing circumstances, the court finds that the proffered evidence of Frappier or Deutsch is not sufficiently reliable to be considered in imposing sentence. *See e.g. Tardiff,* 969 F.2d at 1287; *United State v. Figaro,*

935 F.2d 4, 8 (1st Cir.1991); *United States v. Harris,* 982 F.2d 317, 318–19 (8th Cir.1992). In addition, it would not be equitable or in the interests of the administration of justice to re-open the mammoth record and lengthy sentencing hearings to receive this evidence at this point in this case.

was also concerned, however, that if he collaborated with Caruana he might end up being sentenced to 20 years in prison. *See* Feb. 14, 1981 Tr. (190) at 4. Nevertheless, Angiulo was willing to at least speak with Caruana.

Angiulo met with Caruana later and described some of their discussion to Zannino in electronically surveilled conversation. The evidence does not indicate, however, that Angiulo ever used his influence with Bulger and Flemmi to assist Caruana's attempted extortion.

The government, however, represents that Cucinotta would testify that, "Patriarca met with Caruana and two members of the Irish mob in the Boston area to settle a dispute between them and Caruana." Cucinotta Proffer at 2. In the context of the foregoing electronic surveillance evidence, the court finds this statement to be credible and infers that the meeting concerned Caruana's problems with Lepere and Dailey.[10] The court also infers that the meeting included discussion of both Caruana's demand for payment and the threats made by Lepere and Dailey against Caruana.

It has not been proven that Lepere and Dailey ever paid Caruana anything. Rather, it appears they did not. It seems clear that the $333,000 Angiulo speculates that Caruana paid the defendant does not relate to the attempted extortion of Lepere and Dailey; in February 1981, Angiulo characterized that purported payment as being made "a long time ago." *See* Feb. 14, 1981 Tr. (190) at 1. In discussing Lepere and Dailey a month later, Angiulo said, "Caruana can't get the money." *See* Mar. 10, 1981 Tr. (304(i)) at 10.

Based on the foregoing, the court concludes that the defendant conspired with Caruana, and aided and abetted Caruana's unsuccessful attempt, to extort $1,000,000. The defendant committed these crimes in his capacity as a member of the Patriarca Family and in furtherance of the RICO conspiracy to which he pled guilty. This crime was within the scope of the joint criminal activity to which Patriarca agreed and in furtherance of it. It is, therefore, relevant conduct.

■ The offense is governed by § 2B3.2, which is captioned "Extortion by Force or Threat of Injury or Serious Damage," and provides a Base Offense Level of 18 and a four point enhancement because of the amount demanded. The defendant contends, however, that he is entitled to a three point reduction under § 2X1.1, which applies to certain conspiracies and attempts. The most relevant First Circuit cases, however, indicate that the defendant is not eligible for such a reduction. *See United States v. Egemonye*, 62 F.3d 425, 429–30 (1st Cir. 1995); *United States v. Chapdelaine*, 989 F.2d 28, 35–36 (1st Cir.1993); *cert. denied.* —— U.S. ——, 114 S.Ct. 696, 126 L.Ed.2d 663 (1994).

Section 2X1.1 is potentially applicable to the unsuccessful conspiracy to extort Lepere and Dailey. It is captioned "Attempt, Solicitation, or Conspiracy (Not Covered by a Specific Offense Guideline)." Application Note 1 lists offenses which are expressly covered by other Offense Guidelines and, therefore, not subject to § 2X1.1. Section 2B3.2 is not among them.

Moreover, the Court of Appeals for the First Circuit has stated that there is the "possibility of a discount [under § 2X1.1] where the underlying crime is merely an attempt or conspiracy." *Egemonye*, 62 F.3d at 430. The conspiracy and attempt to extort Lepere and Dailey is such an offense. 18 U.S.C. § 1951(a) makes it a criminal offense to attempt or conspire to commit extortion. Section 1951(b)(2) defines "extortion" in pertinent part as "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear ..." Thus, § 1951 expressly applies to an attempt to commit extortion, as well as to an extortion, which requires that

**10.** The court has not deemed it necessary to have Cucinotta testify on this point. If the defendant wishes to claim that he should be allowed to question Cucinotta concerning it, he shall do so immediately. The government shall respond to any such request promptly. The court will, if necessary, consider further whether Cucinotta should be required to testify on the question whether Patriarca met with Caruana and members of the "Irish Gang" in connection with Caruana's attempt to extort Lepere and Dailey.

the property of another have actually been obtained.

Sections 2X1.1(b)(1) and (2) provide a three level reduction for attempts or conspiracies unless the defendant or his coconspirators completed all of the acts believed necessary for the "successful completion of the substantive offense." In *Egemonye*, however, the Court of Appeals essentially interpreted these provisions as if they did not include the term "successful." 62 F.3d at 429 (§ 2X1.1 sets the offense level for an attempt or conspiracy at three less than the substantive offense "unless the defendant (or his coconspirators) have completed all of the acts believed necessary for the substantive offense . . ."). Consistent with this, the Court of Appeals for the First Circuit held in *Chapdelaine* that:

> In our view, [§ 2X1.1(b)] reflects a policy decision that conspiracies and attempts should be treated like substantive offenses for sentencing purposes if the substantive offense was nearly completed, and the defendant did not voluntarily withdraw.

989 F.2d at 36.

In this case, the substantive offense constituting relevant conduct was, in effect, a conspiracy to extort, or aiding and abetting an attempt to extort. The offense was, therefore, complete, although it was not successful because no money was paid to Caruana and thus no extortion occurred. This court concludes, however, that the Court of Appeals for the First Circuit interprets the discount provided by § 2X1.1(b) to be unavailable to the defendant in these circumstances.[11]

■ It has not been proven that either an aggravating or mitigating role adjustment is appropriate for the defendant's participation in the attempted extortion of Lepere and

Dailey.[12] *See* §§ 3B1.1 and 3B1.2. An aggravating role adjustment is not appropriate because the defendant did not organize or take a leading role in the commission of the crime. The attempted extortion was conceived and initially conducted independently by Caruana, who did not consult the defendant until he encountered difficulties. The defendant did not control Caruana, make key decisions, or claim a larger share of the fruits of the crime. Although Patriarca eventually assisted Caruana in a meaningful way, he was not essential to the attempted extortion. In these circumstances, an enhancement for being a "leader" or "manager" is not appropriate. *See* § 3B1.1, Application Note 4; *United States v. Sostre*, 967 F.2d 728, 733 (1st Cir.1992) (while appellant played an "essential" role in the conspiracy, he did not act in a managerial or supervisory capacity).

■ Although it is a closer question, the defendant has not proven that he is entitled to a reduction in his Offense Level for being a "minor" or "minimal" participant. The defendant was less important to the attempted extortion than Caruana. His involvement, however, made a distinct contribution to Caruana's effort to pursue his initially unsuccessful attempted extortion. The defendant participated in a meeting with representatives of the Winter Hill Gang intending to both continue Caruana's effort to extort Lepere and Dailey and to try to assure Caruana's safety. The court infers the defendant did so as a representative of his father and of the LCN. This was a material, rather than peripheral, contribution to the crime. Thus, the court does not find that Patriarca was either a "minor" or "minimal" participant in the attempted extortion. *See United States v. Palinkas*, 938 F.2d 456, 460 (4th Cir.1991), *vacated on other grounds*, 503 U.S. 931, 112

---

11. The issue of whether the defendant is entitled to a three level reduction under § 2X1.1 is not material to the calculation of the Guidelines. If the attempted extortion of Lepere and Dailey were rated as a Level 19, rather than a Level 22, it would add ½ unit, rather than 1 unit, for the purposes of the multiple count adjustment. *See* § 3D1.4. The defendant would then have either 3½ or 4½ units. *See* § IX and note 19, *infra* and Ex.A. hereto. Pursuant to § 3D1.4, there is a 4 level increase in the Total Offense Level for 3½ to 5 units.

12. In the March 30, 1995 Addendum to Presentence Report of 1992, the Probation Department recommended that the defendant be given a four level reduction as a "minimal" participant. *See* PSR, §§ 50, 51. The government not only objects to this rating, but asserts that the defendant should receive a four level upward adjustment as an organizer and leader of the attempted extortion. *See* Addendum to Addendum to Presentence Report of 1992 at 9.

S.Ct. 1464, 117 L.Ed.2d 610 (1992) (the critical inquiry is not whether the defendant did fewer bad acts than codefendants, but whether his conduct was material or essential to the offense); *United States v. Thomas*, 932 F.2d 1085, 1092 (5th Cir.1991) (to be a minor participant, defendant must do enough less than other participants to have been at best peripheral to the advancement of the illicit activity).

## V. CARROZZA'S DRUG DEALING IN 1985

In 1992, this court found that the defendant did not in 1985 know about Robert Carrozza's personal involvement in drug crimes, and that such crimes were neither within the scope of his Travel Act conspiracy with Carrozza, nor a reasonably foreseeable consequence of it. *Patriarca*, 807 F.Supp. at 182–83, 207–08. Thus, the court found Carrozza's drug activity did not constitute relevant conduct of Patriarca. *Id.* This court's factual findings concerning Patriarca's knowledge of Carrozza's drug dealing were not challenged by the government on appeal. *Patriarca*, 4 F.3d at 73. The Court of Appeals did, however, remand this matter, among others, for a determination of whether Carrozza's drug crimes were in furtherance of the joint criminal activity agreed to by Patriarca and a reasonably foreseeable consequence of such activity. *Id.* at 76. The court finds that it was neither.

The evidence demonstrates that in 1985, Carrozza was a member of the Patriarca Family. He was personally involved in drug dealing. More specifically, Carrozza conspired to possess cocaine with intent to distribute it and, at times, handled the drugs himself.

Carrozza's conduct violated the Patriarca Family's previously described policy and practice of prohibiting members from being directly involved with drugs. Despite this rule, some members who engaged in loan-sharking lent money to drug dealers. *See United States v. DiGiacomo*, 746 F.Supp. 1176, 1183 (D.Mass.1990); Aug. 30, 1983 Tr. (6A) at 1. The court also infers that Patriarca himself expected to profit if Caruana succeeded in his attempt to extort Lepere and

Dailey because of their drug activities. At no time, however, did Patriarca agree with members of the Family to engage jointly in the possession of cocaine with intent to distribute it, or to conspire to do. To the contrary, at least through the October 29, 1989 induction ceremony, Patriarca participated in informing members that drug dealing by them was prohibited. *See* Oct. 29, 1989 Tr. (4–5/Q–6) at 32.

For present purposes the court assumes that Carrozza believed that he was selling cocaine in his capacity as a member of the Patriarca Family and at times shared some of the proceeds with at least his half-brother Joseph Russo, who was also a member of the Family. The court finds once again, however, that Carrozza successfully concealed this conduct from Patriarca and never paid the defendant, directly or indirectly, any portion of the proceeds of his drug crimes. Thus, the court finds that Patriarca did not tacitly agree to engage jointly with Carrozza in drug crimes. Such crimes were not within "the scope of the specific conduct and objectives embraced by the defendant's agreement." *Patriarca*, 4 F.3d at 76.

Nor was Carrozza's personal involvement in the distribution of cocaine a reasonably foreseeable consequence of the criminal activity Patriarca agreed to undertake jointly. As described earlier, under both the defendant and his father the Patriarca Family had a rule against members being directly involved with drugs. The rule was followed prior to Raymond L.S. Patriarca's death.

During the pertinent period, the defendant did not know that as a result of the disruption of the Family caused by his father's death and the prosecution of Angiulo and others, some members in Boston were violating this rule. Thus, a reasonable person who knew everything the defendant knew would not have been able to know in advance, with a fair degree of certainty, that Carrozza would be conspiring to distribute cocaine or personally doing so. *See LaCroix*, 28 F.3d at 229.

In these circumstances, Carrozza's drug dealing does not constitute relevant conduct of Patriarca.

## VI. THE 1985 LIMOLI MURDER

█ For similar reasons, the 1985 murder of Vincent James Limoli does not constitute relevant conduct of Patriarca. As set forth below, Limoli was murdered because he stole cocaine belonging to Spagnolo, a member of the Patriarca Family. Patriarca did not know of, or agree to, Spagnolo's violation of the Family's rule against members dealing drugs. Accordingly, Spagnolo's drug activity was outside the scope of the criminal activity Patriarca agreed to undertake jointly.

In addition, as this court found in 1992, and now upon further consideration reaffirms, Patriarca was not asked to authorize the Limoli murder and did not know about it. *Patriarca*, 807 F.Supp. at 203–05. Thus, the killing of Limoli also violated the Patriarca Family rule against members committing murder without the authorization of the Boss. As described earlier, the evidence indicates that in 1985 this violation was unprecedented. Therefore, in view of all the circumstances, it has not been shown that a reasonable person, knowing what Patriarca knew at the time, would have foreseen the murder of Limoli with a fair degree of certainty. *See LaCroix*, 28 F.3d at 229.

Accordingly, the Limoli murder was not a reasonably foreseeable act of Patriarca's co-conspirators acting in furtherance of the criminal activity he and they jointly undertook. It is, therefore, not relevant conduct of Patriarca.

This court has had extensive exposure to the evidence relating to the Limoli murder in several cases over the past five years. The court was first introduced to the Limoli matter in 1990, when the government, in attempting to secure Spagnolo's pretrial detention, erroneously asserted that he participated in killing Limoli. *See DiGiacomo*, 746 F.Supp. at 1189. The Limoli murder was also a prominent event in the pretrial proceedings concerning Patriarca and his co-defendants, including Pasquale Barone's successful effort to suppress certain evidence. *See United States v. Barone*, 968 F.2d 1378, 1379 (1st Cir.1992). This court also dealt with the Limoli murder in the sentencing of Ferrara, who admitted to ordering it. *See United States v. Carrozza*, 807 F.Supp. 156, 159 (D.Mass.1992). Limoli's death was focused upon in Patriarca's initial sentencing. *Patriarca*, 807 F.Supp. at 203–05. This court subsequently presided at the eleven week trial of Barone, who was convicted of participating in the Limoli murder and sentenced to life in prison.

The court has, nevertheless, carefully considered the arguments and evidence relating to the Limoli murder presented in connection with Patriarca's resentencing. The court once again finds the basic facts to be as they were determined to be at the defendant's initial sentencing and, addressing the questions posed by the Court of Appeals for the First Circuit to be decided on remand, concludes that the Limoli murder is not relevant conduct of Patriarca.

More specifically, the court finds that in 1985 Spagnolo was a member of the Patriarca Family residing in Boston. Spagnolo, like Carrozza, was then personally and directly dealing cocaine. Spagnolo, however, concealed this violation of Family rules from Patriarca. Patriarca did not have reason to foresee that Spagnolo would become involved personally with distributing cocaine. In 1985, such conduct was outside the scope of criminal activity Patriarca agreed to jointly undertake and was not a reasonably foreseeable consequence of that agreement.

In 1985, Spagnolo had cocaine belonging to him hidden in an apartment. It had been placed there for Spagnolo by Frank Salemme, Jr., who was not a member of the Patriarca Family.

At that time, Limoli was an associate of Ferrara. Like Spagnolo, Ferrara was a soldier in the Boston faction of the Patriarca Family, who successfully concealed at least some of his criminal activity from the Boss, and often, if not always, failed to share the fruits of his crimes with Patriarca, directly or indirectly.

Limoli stole the cocaine belonging to Spagnolo under the mistaken belief that it belonged to Frank Salemme, Jr., with whom Limoli had a dispute. Spagnolo suspected Limoli. He asked Ferrara to intercede and get his cocaine back. Ferrara confronted Limoli, who denied he was involved with the

theft. After Spagnolo threatened him, Limoli confessed, much to the embarrassment of Ferrara who had stood up for him. As a result, Ferrara asked Limoli's best friend, Barone, to murder Limoli. Barone was not a member of the LCN, but hoped to become one. To improve his prospects, Barone enlisted the assistance of his brother-in-law, Walter Jordan, and they murdered Limoli.

The court again finds that neither Ferrara nor anyone else sought or received Patriarca's authorization for the Limoli murder. As described earlier, although he did not then realize it, the defendant did not in 1985 have effective control over the Boston faction of the Family. Carrozza and Spagnolo secretly violated his rule by being personally involved in dealing drugs. Other members, like Ferrara, violated the rule, as it was explained by Hillary, by permitting their direct associates to traffic in narcotics. The fact that Limoli was in jeopardy because of violations of the Patriarca Family rule regarding drugs gave Ferrara a powerful incentive not to ask Patriarca for permission to have Limoli killed. The court again finds that neither Ferrara nor anyone else consulted Patriarca concerning the Limoli murder. *See Patriarca,* 807 F.Supp. at 203–05.

The Limoli murder resulted from a drug crime which was neither within the scope of the criminal activity that Patriarca agreed to jointly undertake nor a reasonably foreseeable consequence of such criminal activity. If Patriarca had agreed, explicitly or implicitly, to drug dealing on behalf of the LCN Family of which he was the titular head, the court would be presented with a serious question of whether an unauthorized murder in furtherance of such criminal activity was reasonably foreseeable. As the Court of Appeals for the First Circuit recognized in *Bianco,* the possession of firearms is a foreseeable concomitant of substantial drug dealing. 922 F.2d at 912–14. Arguably, a corollary of this conclusion is that the use of such weapons to kill when drug dealers encounter difficulties is also foreseeable. However, as the defendant did not explicitly or implicitly agree to drug dealing by members the Boston faction of the Family, it is not necessary to resolve this question in this case.

In essence, this court finds the Limoli matter to be a matter which is materially different than the example quoted earlier from Application Note 2 to § 1B1.3. *See* page 607, *supra.* To elaborate on that example, the court recognizes that if a defendant agrees to jointly undertake an armed bank robbery, but states that he does not agree that the weapons being carried may be fired, he is nevertheless responsible if a teller who resists the robbery is shot by his coconspirator because that danger is inherent in the nature of the crime and a reasonably foreseeable consequence of it. If, however, the defendant sought to obtain the bank's funds by conspiring with a teller to embezzle them, he would not be responsible at sentencing if a bank manager was shot because his coconspirator decided to commit an armed robbery instead; this danger is not inherent in the nature of embezzlement and not the sort of harm a reasonable person conspiring to commit that crime would anticipate.

The LCN is often involved with crimes with far more potential for violence than embezzlement. In this case, however, the analogy is apt. As drug dealing by Spagnolo or other members of the Family was not within the scope of the Patriarca's jointly undertaken criminal activity, the unauthorized Limoli murder was not a reasonably foreseeable act in furtherance of such activity. It is, therefore, not relevant conduct.

## VII. THE 1986 BERNS MURDER

With regard to the 1986 killing of Ted Berns, the court concludes that, pursuant to the Pinkerton principles that define relevant conduct, the defendant is punishable as an accessory after the fact. He is entitled to a reduction in his Offense Level for being a "minimal" participant, although he did not authorize, or know about, the murder of Berns by Caruana or William Grasso's later effort to assist Caruana by arranging the burial of Berns body. In summary, Grasso was an accessory after the fact to the Berns murder, arranged the burial of his body to further his agreement with Patriarca to harbor Caruana as a fugitive, and his conduct was a reasonably foreseeable consequence of

that crime. Thus, Patriarca is vicariously responsible for it.

More specifically, having carefully considered all of the evidence and arguments concerning this matter, the court finds as follows. In 1986, Caruana was an associate or, if Cucinotta is correct, a member of the Patriarca Family; his precise status is not material. In either case, the Patriarca Family assisted Caruana's flight from the charges pending against him in Boston. The defendant was involved, at least indirectly, in this effort. Caruana was living in Connecticut. His link to the Patriarca Family at that time was William Grasso, who was also known as the "Wild Guy." Leonetti's testimony, among other things, indicates that the defendant did not have effective control of Grasso in this period. *See Patriarca*, 807 F.Supp. at 207.

Although Caruana was living with another woman, he was passionately jealous of his wife, who had remained in Massachusetts and who Caruana believed was having a love affair with Ted Berns. *See, e.g.*, Defendant's Supplemental Exhibit List, Ex. G (Translated/Decoded letter from Salvatore Michael Caruana to his wife). As a result, on or about August 28, 1986, the last date on which Berns was seen by his wife, Caruana kidnapped Berns and killed him.

As a fugitive, Caruana would not, without planning, have encountered Berns. Therefore, the court infers that this crime was a premeditated, first degree murder. It was not, however, a crime committed on behalf of the Patriarca Family. Rather, it was a result of an unauthorized, personal vendetta of Caruana, which was not reasonably foreseeable by Patriarca.

More specifically, for present purposes the court assumes, without finding, that Caruana was at the time of the murder a member of the Patriarca Family. Contrary to the government's contention, however, it has not been proven that the LCN or Patriarca Family had a rule requiring that a non-member having an affair with a member's wife be killed. It is true that members were admonished not to become involved with another member's wife. *See* Oct. 29, 1989 Tr. (Y-5/Q6) at 9; Defendant's Second Supplemental

Exhibit List, Ex. I(C) (Joseph Bonnano, *A Man of Honor*, at 154–55). It is also true that Zannino was intercepted telling a new member that the Family would kill someone who slapped his wife around. The evidence does not, however, establish that there was an LCN rule, let alone a Patriarca Family practice, that would require that a person such as Berns, who was not a member, be killed for becoming involved with a member's wife. Rather, in some instances affairs by wives of LCN members were knowingly tolerated. *See* Defendant's Second Supplemental Exhibit List/Documents, Ex. I(D) (*United States v. Theodore Persico*, Mar. 16, 1994 Tr. at 3886).

In any event, despite the rule requiring that members receive permission from the Boss to commit murder, the evidence persuades the court that Caruana did not consult either Grasso or the defendant before killing Berns. As the Patriarca Family was trying to hide Caruana, it would have been extremely foolish for its members to agree to draw attention to him by authorizing the Berns murder. In addition, Grasso expressed surprise that the murder had occurred, saying to Salvatore D'Aquila, who was enlisted to participate in burying Berns: "Imagine that nut [Caruana] brought a body down to bury someone who was having a relationship with his wife." *United States v. Bianco*, Nov. 5, 1991 Tr. at 10.

 As the killing of Berns by Caruana was a crime motivated by passion, rather than one committed to serve the interests of the Patriarca Family, it was not an act in furtherance of the criminal activity jointly agreed to by Patriarca with Caruana. *See Pinkerton*, 328 U.S. at 647, 66 S.Ct. at 1184. Rather, as described earlier, the crime was plainly adverse to the joint effort to see Caruana escape prosecution of the marijuana charges against him. Similarly, the killing was not part of any pattern of racketeering activity relating to the Patriarca Family because while murder is a RICO predicate, *see* 18 U.S.C. § 1961(1), the Berns' murder was not related to any other racketeering act Caruana may have committed and did not amount to, or pose a threat of, continued criminal activity. *See United States v. Boy-*

**626**

*lan,* 898 F.2d 230, 250 (1st Cir.), *cert. denied,* 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990).[13]

Nor was Berns' death a reasonably foreseeable consequence of any criminal activity Patriarca agreed to undertake jointly. As stated earlier, the defendant agreed to assist Caruana's flight from his indictment. The murder of Berns, which was so obviously injurious to that effort, is not something that a reasonable person in Patriarca's position at the time "would have been able to know in advance with a fair degree of probability." *LaCroix,* 28 F.3d at 229.

On August 31, 1986, Caruana met with Grasso, told him for the first time of the Berns' murder, and asked for Grasso's assistance in burying the body. It is not proven that Grasso consulted the defendant. Rather, the court finds that as the member of the Patriarca Family primarily responsible for harboring Caruana as a fugitive, Grasso alone decided to help him. Thus, Grasso arranged for the use of Richard Beedle's garage, where Berns was buried on September 7, 1986.

■ Accordingly, Grasso was an accessory after the fact to Berns' murder. In committing this crime, Grasso was acting in furtherance of criminal activity he and Patriarca jointly agreed to undertake, the harboring of Caruana as a fugitive. The court finds that although Patriarca did not know about or authorize the burial of Berns, it was reason-

ably foreseeable. More specifically, the court concludes that having conspired with Grasso to harbor Caruana as a fugitive, a reasonable person would have foreseen that Grasso would be likely to attempt to protect Caruana by helping him dispose of the body of anyone Caruana killed, no matter how foolishly.

As Grasso served as an accessory after the fact to the Berns' murder in furtherance of the criminal conduct he and Patriarca jointly agreed to undertake, and as a reasonably foreseeable consequence of it, Patriarca also must be deemed an accessory after the fact to that murder for the purpose of sentencing. Thus, the court is confronted with the apparently unprecedented question of whether this crime is a RICO predicate and, therefore, constitutes relevant conduct. The court concludes that it does.

■ As described earlier, the Court of Appeals for the First Circuit held, in remanding this matter, that "the term 'underlying racketeering activity' in § 2E1.1(a)(2) means simply any act, whether or not charged against defendant personally, *that qualifies as a RICO predicate act under 18 U.S.C. § 1961(1)* and is otherwise relevant conduct under § 1B1.3." *Patriarca,* 4 F.3d at 77 (citation omitted) (emphasis added). As the parties properly stipulated in eliminating the harboring of Caruana as an instance of alleged relevant conduct to be con-

---

13. The court understands that D'Aquila was convicted in Connecticut of being an accessory after the fact to the murder of Berns by Caruana, which was alleged to have been committed to maintain or increase Caruana's position in the Patriarca Family. *See United States v. Bianco,* Superseding Indictment, Count 6, ¶¶ 2 and 3. The court has considered this fact. *See United States v. Berzon,* 941 F.2d 8, 19–20 (1st Cir.1991). However, neither Patriarca nor anyone representing his interests was a party to that proceeding. Thus, the defendant did not have a full and fair opportunity to litigate whether the Berns murder was committed on behalf of the Patriarca Family. He is, therefore, not bound by the verdict or any factual findings implicit in it. *See Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979); *South Boston Allied War Veteran's Council v. Boston,* 875 F.Supp. 891, 908–09 (D.Mass.1995). Moreover, Caruana was not a defendant in the *Bianco* case and no one else was charged with

participating in the Berns murder. This court has not been presented with any evidence introduced in the *Bianco* case to prove that Caruana killed Berns to maintain or improve his position with the Patriarca Family. It is not clear that there was any such evidence at the *Bianco* trial or that it would be deemed sufficiently reliable to be considered with regard to Patriarca's sentencing.

In any event, the court has a duty to make an independent assessment of the evidence at sentencing and may, upon a proper record, reach a decision which differs from a jury's even where, in contrast to this case, the defendant was a party to the prior proceeding. *See, e.g., United States v. Mocciola,* 891 F.2d 13, 16–17 (1st Cir. 1989). This court has carefully evaluated the evidence presented concerning the Berns' murder and has found that it was not a crime committed in furtherance of criminal activity Patriarca agreed to jointly undertake.

sidered on remand, the crime of harboring a fugitive is not a RICO predicate act under 18 U.S.C. § 1961(1). There remains, however, a serious question whether the crime of being an accessory after the fact to murder is a RICO predicate act.

Section 1961(1) defines "racketeering activity" as, among other things, "any act ... involving murder." The defendant correctly argues that in contrast to criminal liability as an aider and abettor or coconspirator, accessory after the fact liability presupposes completion of the underlying crime before the defendant's acts take place.[14] *See, e.g., United States v. Balano*, 618 F.2d 624, 631 (10th Cir.1979). If the defendant acted to assist before the crime was complete, he would be an aider and abettor. *See United States v. Barlow*, 470 F.2d 1245, 1252 (D.C.Cir.1972). In contrast to an aider and abettor who is, under 18 U.S.C. § 2, subject to punishment as a principal, an accessory after the fact, under 18 U.S.C. § 3, may receive only one-half of the maximum sentence prescribed for a principal.

In deciding that a prior conviction for being an accessory after the fact to murder did not constitute a "crime of violence" for the purpose of the Career Offender provision of the Guidelines, § 4B1.1, the Court of Appeals for the Ninth Circuit emphasized the distinction between being an aider and abettor and being an accessory after the fact, stating that:

> the offense of being an accessory *after* the fact is clearly different from aiding and abetting. Unlike one who aids or abets a crime of violence, an accessory after the fact does not aid in the commission of the underlying offense. Similarly, unlike one who conspires to commit a crime of violence, an accessory after the fact does not agree to commit the crime of violence.

*United States v. Innie*, 7 F.3d 840, 852 (9th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1567, 128 L.Ed.2d 212 (1994) (emphasis added).

 Nevertheless, this court concludes that the crime of accessory after the fact to murder is a RICO predicate. In *Innie*, the court was interpreting a section of Guidelines which required it to determine whether a prior conviction was "a crime of violence." *See* U.S.S.G. § 4B1.1. In contrast, § 1961(1) does not provide that only murder is a RICO predicate. Nor does it state that the defendant must have been "involved in a murder" to have committed a RICO predicate. If § 1961(1) was written in this fashion, the distinction between being an aider and abettor and an accessory after the fact would be legally significant. Section 1961(1), however, states that "any act ... involving murder" is a RICO predicate. In this context, to "involve" means "to relate closely." *See Webster's New International Dictionary Unabridged* 1191 (3d ed. 1981). The court finds that being an accessory after the fact to murder relates closely to murder. Thus, § 1961(1) makes the crime a RICO predicate.

 Accordingly, Patriarca's status as an accessory after the fact to the Berns' murder constitutes relevant conduct. The Base Offense Level for the offense is 30.[15] The defendant is entitled to a four level reduction in his Offense Level because he was, at most, a "minimal" participant. *See* § 3B1.2.

Application Note 2 to § 2X3.1 states that: "The adjustment from § 3B1.2 (Mitigating Role) *normally* would not apply [when the crime is accessory after the fact] because an adjustment for reduced culpability is incorporated in the base offense level." (emphasis added). This provision plainly contemplates,

---

14. 18 U.S.C. § 3 provides that: "Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts, or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact." Thus, the elements of this offense are that: (1) the principal committed a crime; (2) the defendant had actual knowledge of the crime; and (3) the defendant in some way assisted the principal in order to hinder or prevent his apprehension, trial, or punishment. *See Hiram v. United States*, 354 F.2d 4, 6 (9th Cir.1965); *United States v. Lepanto*, 817 F.2d 1463, 1467 (10th Cir.1987).

15. Section 2X3.1, "Accessory After the Fact," provides that the Base Offense Level is "6 levels lower than the offense level for the underlying offense, but in no event ... more than 30." As a first degree murder, the Base Offense Level for the underlying killing of Berns is 43. *See* § 2A1.1

however, the possibility of an "abnormal" or extraordinary case in which a reduction for role in the offense would be appropriate. With regard to Patriarca, this is such a case. As described earlier, to be punished as an accessory after the fact, typically a defendant must be proven to have known about a completed crime and acted to assist the principal to escape the consequences of it. *See Hiram,* 354 F.2d at 6; *Lepanto,* 817 F.2d at 1467. In this case, however, Patriarca did not know in advance of the Berns' murder or the burial of his body. Nor did Patriarca do anything to help Caruana get away with his crime. Rather, Patriarca has been held liable as an accessory after the fact by operation of the *Pinkerton* principles which define relevant conduct. Once again, this is unusual, if not unprecedented, rather than "normal." Thus, a reduction for Patriarca's mitigating role is warranted.

■ With regard to the burial of Berns, Patriarca was, at most, a "minimal" participant. Although he held the title of "Boss" he did not know about, or personally participate in, the commission of the offense. Thus, an enhancement for an aggravating role is clearly not appropriate. *See* § 3B1.1, Application Note 4 ("titles such as ... 'boss' are not controlling"). Rather, Patriarca's lack of personal involvement or knowledge of the activities of others regarding the murder of Berns and the burial of his body indicate that he should be deemed a "minimal" participant and receive an associated four level decrease in his Offense Level. *See* § 3B1.2, Applica-

tion Note 1 ("defendant's lack of knowledge ... of the activities of others is indicative of a role as minimal participant"); *United States v. Daughtrey,* 874 F.2d 213, 216 (4th Cir.1989) ("Whether Role in the Offense adjustments are warranted is to be determined not only by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable, *see* Guideline § 1B1.3, but also by measuring each participant's individual acts and relative culpability against the elements of the offense of conviction."); *Palinkas,* 938 F.2d at 460 ("The critical inquiry is ... whether the defendant's conduct is material or essential to committing that offense.").

## VIII. DEPARTURE

■ The defendant has asserted that a downward departure would be warranted if he were required to be sentenced to 65 years in prison or, indeed, if the Guideline range for his sentence is increased as a result of a finding that crimes committed by others are relevant conduct. As the murders of Berns and Limoli are not relevant conduct, the Guidelines do not require that the defendant be given a 65–year sentence. Thus, the propriety of a departure on this basis need not be decided.[16]

There are present at this point, however, other circumstances that for four of Patriarca's co-defendants the government asserted, and the court agreed, justified downward departures. *See Carrozza,* 807 F.Supp. at 158–59, 165.[17] By being the first to plead

---

**16.** The court notes, however, it appears that if the Berns or Limoli murders were found to be relevant conduct, a downward departure would be warranted. The court has found, in effect, that those who killed Berns and Limoli were guilty of first degree murder, a level 43 offense requiring a sentence of life in prison or, for Patriarca who was not charged with an offense punishable by life imprisonment, consecutive sentences amounting to 65 years in prison. *See* § 2A1.1. Application Note 1 to § 2A1.1 states that: "If the defendant did not cause the death intentionally or knowingly, a downward departure may be warranted." This advice seems to be addressed to a situation where, as would be the case here, the defendant's liability is based on felony-murder principles; if the individual who personally committed the crime did not cause the death intentionally, he would not have committed first degree murder. *See, e.g.,* 32, Joseph R.

Nolan & Bruce R. Henry, *Massachusetts Practice* §§ 174 and 176 at 127–29 (1988) (In Massachusetts, "[i]n all cases the crime of murder, both first and second degree, requires the unlawful killing of a human being with malice ... [M]alice is ... an intent to inflict injury without legal justification ..."). While Application Note 1 goes on to say that the "Commission does not envision that departure below [second degree murder, which has a Base Offense Level of 33] is likely to be appropriate," a greater departure is permissible and might be appropriate here. *See United States v. Rivera,* 994 F.2d 942, 948 (1st Cir.1993).

**17.** Although the court did not decide the issue at Carrozza's sentencing, *see Patriarca,* 4 F.3d at 85–6, it has become clear in subsequent proceedings that his sentence represented a downward departure.

guilty, Patriarca, like his codefendants, made "an indispensable contribution to resolving all of the charges concerning all of the codefendants [who would have been] on trial with him." *Id.* at 159; *see also United States v. Garcia,* 926 F.2d 125, 127–28 (2d Cir.1991); *United States v. Agu,* 949 F.2d 63, 67 (2d Cir.1991) *cert. denied* 504 U.S. 942, 112 S.Ct. 2279, 119 L.Ed.2d 205 (1992); *but see United States v. Dorsey,* 61 F.3d 260, 262 (4th Cir.1995). As a result, significant judicial and prosecutorial resources were freed to be devoted to other important matters, rather than to a lengthy trial of this case. *Id.* Patriarca's plea also assured that he would not be acquitted, and that reluctant witnesses being protected by the government would not have to testify. *Id.* at 160–61.

In contrast to the five codefendants described in the *Carrozza* sentencing decision and other members of the Patriarca Family sentenced by this court, including Biagio DiGiacomo, Antonio Spagnolo, and Vincent Giocchini, Patriarca did not enter into a Fed. R.Crim.P. 11(e)(1)(C) binding plea agreement with the government, and the sentencing in his case has been extremely time consuming. The court, however, would not be inclined to penalize Patriarca for this if a downward departure were otherwise appropriate because the government is responsible for this distinction between Patriarca's case and the cases of other members of the Patriarca Family.

In the other cases before this court concerning members of the Patriarca Family, the government urged the court to approve downward departures or Guideline sentences by calculating the sentencing range based only on the predicate acts charged against the defendant, without regard to any possible relevant conduct relating to those predicate acts, let alone relevant conduct relating to uncharged racketeering activity of others. *See Patriarca,* 807 F.Supp. at 178. For example, although Spagnolo and Carrozza were directly involved in the events which led to Limoli's death, the government did not claim that murder was relevant conduct for either of them. *Id.* If the government had taken a consistent position with regard to Patriarca, the court would have understood his maxi-

mum sentence to be 78 months and no litigable issues would have been presented.

The government did not, however, take a consistent position with regard to Patriarca. Rather, only after Patriarca informed the court, in November 1991, of his intention to plead guilty did the government mention that it would seek to have his Base Offense Level increased on the basis of relevant conduct for matters, such as Caruana's drug activity, for which the government thought it had proof of the defendant's direct involvement. *Id.* at 176–77. It was not until after he pled guilty that Patriarca was put on notice that the government would seek his punishment for crimes, including the Berns and Limoli murders, which might raise the applicable Guidelines from a maximum of a 78 month sentence to 65 years. In view of these circumstances, and the previously unsettled nature of the applicable law, the court is not now of the view that the litigation concerning the proper sentence for Patriarca, which would have been necessary if Patriarca had been convicted after a lengthy trial, should operate to deprive him of any downward departure which would otherwise be warranted.

Patriarca asserts that there are also other factors which justify a downward departure, including his recurring bladder cancer. The record, however, does not indicate that the defendant now has the sort of "extraordinary physical impairment" which would alone justify a downward departure. *See* § 5H1.4. The court recognizes, however, that Patriarca's cancer might be a circumstance which, in combination with other factors, could contribute to a finding that this is an "extraordinary case." *See* § 5K2.0, Commentary ("The Commission does not foreclose the possibility of an extraordinary case that, because of a combination of ... characteristics or circumstances, differs significantly from the 'heartland' cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case."); *United States v.*

*Bowser*, 941 F.2d 1019, 1024–25 (10th Cir. 1991) (departure justified based on a combination of factors, none of which alone would be sufficient); *United States v. Cook*, 938 F.2d 149, 153 (9th Cir.1991); *United States v. One Star*, 9 F.3d 60, 61 (8th Cir.1993).

It is, however, neither necessary nor appropriate for the court to decide whether this is, as Patriarca contends, a case which falls outside of the "heartland" contemplated by the Sentencing Commission. Both 18 U.S.C. § 3553(b) and § 5K2.0 provide that the court may depart if it finds extraordinary circumstances, not adequately taken into account by the Sentencing Commission, "that should result in a sentence different from that" prescribed by the Guidelines. In this case, the court does not find that the arguably extraordinary characteristics should result in a sentence outside the 97 to 121 months required by the Guidelines.

Relevant conduct is a fundamental feature of the Guidelines. The relevant conduct which has been proven here increases the defendant's Guideline range from 63 to 78 months to 97 to 121 months. Although this is a significant increase, the court does not regard it as sufficiently dramatic to justify the exercise of its discretion to depart downward in the circumstances of this case.

The decision not to depart downward is reinforced by the fact that if the court were inclined to do so it might be appropriate to embark on the protracted proceedings which would be necessary to decide whether the government is able to prove additional alleged crimes by Patriarca that it contends would justify an upward departure. After the Probation Department recommended in March 1995 that the court find that only certain matters constitute relevant conduct, with a resulting range for imprisonment of 121 to 151 months rather than 65 years, the government in its objections for the first time suggested that the court should depart upward, pursuant to § 4A1.3, because the defendant's Criminal History Category does not adequately reflect the seriousness of his past criminal conduct or the likelihood that he will commit other crimes in the future. The government's request for upward departure is based on the allegations made by Cucinotta, which the court declined to address as additional instances of possible relevant conduct.

The reasons, explained in the December 7, 1994 Memorandum and Order, which persuaded the court not to allow the government to introduce new alleged instances of relevant conduct on remand are also applicable to the question of whether additional, alleged crimes should be considered for the first time on remand as grounds for possible departure. That initial decision was premised upon: the need to implement faithfully the letter and spirit of the Court of Appeals decision; the desirability of not magnifying the significant, existing question whether the defendant has been unconstitutionally deprived of Due Process because he was not given notice that the government would rely on certain alleged prior bad acts before he pled guilty; and the interests of the administration of justice, including completing this sentencing without months of additional hearings. *See* Dec. 7, 1994 Memorandum and Order. In addition, now introducing additional alleged crimes as a possible basis for upward departure would add force to Patriarca's pending motion to withdraw his guilty plea because he was not given fair notice of the potential penal consequences before he entered that plea.

The court again recognizes that the government has a new witness, Cucinotta. The court is not, however, persuaded that the government has obtained "important new evidence" which justifies an exception to the law of the case doctrine. *See Bell*, 988 F.2d at 251; *Rivera Martinez*, 931 F.2d at 151. At the government's request, the court appointed counsel for Cucinotta and met twice with Cucinotta and his attorney. Those proceedings persuaded the court that Cucinotta, while competent for the purpose of deciding whether to cooperate with the government, was emotionally very fragile and plainly vulnerable to being effectively impeached.[18]

---

18. At the request of Cucinotta, the government, and the defendant, the transcripts of those proceedings remain impounded.

Similarly, Cucinotta's Proffer does not persuade the court that a blatant error in its prior decision will, if uncorrected, result in a serious injustice. *Bell*, 988 F.2d at 251. Rather, because the Guidelines as now calculated by the court provide for a reasonable sentence, the court does not expect it would, in the circumstances of this case, depart upward even if it were proven that Patriarca's criminal history has been understated.

Section 4A1.3 provides, in part that:

If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, *the court may consider* imposing a sentence departing from the otherwise applicable guideline range. (emphasis added).

Thus, if certain circumstances are proven, the court is permitted to depart, but is not required to do so. Like departures under § 5K2.0, departures pursuant to § 4A1.3 are subject to the requirements of 18 U.S.C. § 3553(b), which in this context operates to provide that even if the defendant's criminal history is understated, departure is not appropriate unless the court finds that this understatement should result in a sentence outside the Guideline range. *See Patriarca*, 807 F.Supp. at 197.

The Guidelines as now calculated by the court prescribe a sentence of 97 to 121 months for Patriarca, or about 8 to 10 years. As found previously, Patriarca obtained his position as Boss by virtue of nepotism, not merit; was a weak Boss, whom law enforcement officials claimed "could not lead a Brownie troop;" presided during the decimation of his LCN Family by the government; and has been demoted to the lowest status of "Soldier" in the Family. *Patriarca*, 807 F.Supp. at 171–72. He also suffers from recurring bladder cancer. The government successfully urged this court to depart downward and impose a sentence of 16 years, rather than life, on Joseph Russo, who, among other things, personally murdered a cooperating witness, Joseph "Baron" Barbozza. *See Carrozza*, 807 F.Supp. at 159. Similarly, the government persuaded the court to depart downward and impose a sentence of 22 years, rather than life, on Vincent Ferrara, who was in this case charged with three murders, and believed by the government to have personally committed many more. *Id.* In view of these facts, the principles underlying the law of the case doctrine, and the circumstances described earlier which favor a downward departure for Patriarca, the court finds that even if Patriarca's criminal history were found to be understated, an upward departure would not be appropriate because sentencing him to between about eight and ten years in prison will properly serve the statutory purposes of sentencing. *See* 18 U.S.C. § 3553(a). Accordingly, the extensive litigation that would be necessary to decide the merits of Cucinotta's new allegations in the context of this resentencing is neither necessary nor appropriate.

As the court has observed previously, this decision should not, as a practical matter, permit Patriarca to escape punishment for any crime he may have committed. If the government believes Cucinotta can provide compelling evidence that Patriarca committed other crimes, it may seek his punishment in the traditional manner of obtaining an indictment and, based upon admissible evidence, proving his guilt to a jury beyond a reasonable doubt.

In any event, the court finds that neither an upward nor downward departure is justified in this case. *See United States v. Harotunian*, 920 F.2d 1040, 1043 (1st Cir.1990) (while some factors may militate in favor of an upward departure and others suggest a downward departure, ultimately, at most, a single departure is made).

IX. COMPUTATION OF THE GUIDELINES

The court has found that the defendant is punishable in this sentencing as an accessory

632

after the fact to the Berns' murder, which involves an Offense Level of 30 under § 2X3.1, and is entitled to a 4 level decrease for his "minimal" role in that offense, pursuant to § 3B1.2. Thus, the Total Offense Level for the Berns' matter is 26. This is the highest offense level attributable to any of the crimes to which Patriarca pled guilty or any relevant conduct.

More specifically, the court's previous findings concerning the Guidelines implications of the offenses of conviction were not challenged on appeal and are now reaffirmed. As the court previously found, Racketeering Act F–1, which involved travel between Rhode Island and Massachusetts when the defendant was serving as a reluctant messenger for his father is a Level 6 offense, and no role adjustment is appropriate. *Patriarca*, 807 F.Supp. at 185.

Racketeering Act F–3 involved the August 1985 travel by Carrozza relating to the extortion of Frank Mantia. Once again, the court finds this travel should be rated as a Level 20, rather than the higher level which would be applicable if it were deemed to relate to Carrozza's drug activity. *Id.* at 180. As the defendant was in 1985 the Boss of the Family, a 4 point upward adjustment for his role is again appropriate. *Id.* Thus, the Total Offense Level for Racketeering Act F–3 is 24.

Racketeering Act F–8 involved Matthew Gugliemetti's travel to Connecticut on or about August 10, 1989, and was in furtherance of extortion. *Id.* Therefore, the Base Offense Level is 20, which must be adjusted upward 4 levels for Patriarca's role in the offense. *Id.* It too, then, is a Level 24 offense.

Racketeering Act F–10 related to Joseph Russo's travel before the October 29, 1989

induction ceremony. *Id.* at 181. It has been undisputed that this travel related to structure and should be given a Base Offense Level of 6, and a 4 level role adjustment. It is, therefore a Level 10. *Id.*

Racketeering Act F–11 relates to the travel concerning the October 29, 1989 induction ceremony. *Id.* At the initial sentencing, the Probation Department recommended that this be rated as a Level 6, because it related to structure, and be increased to Level 10 because of the defendant's role. *Id.* The government contended that it should be rated as a Level 20, as travel in aid of extortion, and raised to Level 24 because of Patriarca's role. *Id.* The court found that the travel was most appropriately deemed to be in aid of gambling, a Level 12, or extortion, and a 4 level role adjustment was warranted. *Id.* It was not then material for Guideline purposes whether this travel was a Level 24 or a Level 16. Nor is it now.[19]

Finally, pursuant to § 2B3.2, Caruana's attempt to extort $1,000,000 from Lepere and Dailey is a Level 22 offense, and no upward or downward adjustment for role in the offense is appropriate.

As found previously, although the defendant pled guilty, because he has refused to acknowledge the existence of the LCN or the Patriarca Family, he has not been given a reduction for acceptance of responsibility under § 3E1.1. *Id.* at 174, 177.

Accordingly, as reflected on Exhibits A and B concerning the Multiple Count Adjustments, the defendant's Total Offense Level is 30. His Criminal History Category is I. As explained earlier, no upward departure or

---

19. As the Multiple Count Adjustment attached hereto as Exhibit A reflects, it is immaterial whether the travel relating to the induction ceremony is rated as a Level 16 or a Level 24. If it is a Level 24, it adds 1 unit to the multiple count calculation and the total units are 5. *See* Exhibit

A. If it is rated as a Level 16, it adds no units to the multiple count calculation and the total units are 4. Section 3D1.4, however, provides for an increase of 4 Offense Levels for 3½ to 5 units. Thus, the precise rating of the travel relating to the induction ceremony is not material.

downward departure is justified. Therefore, with regard to the offenses with the greatest maximum possible penalties, the defendant's Guideline ranges are as follows:

| | |
|---|---|
| Imprisonment | 97–121 months |
| Supervised Release | 3 to 5 years |
| Fine | $15,000 to $150,000 |
| Cost of Incarceration [20] | $1,779.33 per month |
| Cost of Supervision | $2,343.60 per year |
| Special Assessment | $350 |

## X. ORDER

A final sentencing hearing will be held at 10:00 a.m. on December 26, 1995. Counsel will be allowed to address where, within the Guideline range as calculated in this Memorandum and Order, sentence should be imposed. The defendant will be afforded an opportunity to speak. Sentence will be imposed.

## EXHIBIT A

### *Multiple Count Adjustment* (See U.S.S.G. C. 3, Pt.D)

Pursuant to U.S.S.G. § 3D1.4, the group with the highest Offense Level and any group equally serious or 1 to 4 levels less serious are counted as 1 Unit. Any Group that is 5 to 8 levels less serious than the Group with the highest Offense Level is counted as ½ Unit. Any group 9 or more levels less serious than the group with the highest Offense Level is to be disregarded for calculation purposes. The following calculation assumes that Group 5 has a Base Offense Level of 20 rather than 12, and that Group 6 has a Base Offense Level of 22 rather than 19. These assumptions do not affect the Total Offense Level.[1]

**20.** If the defendant intends to argue that a cost of imprisonment or supervision fine is inconsistent with the Sentencing Reform Act, he shall file a memorandum supporting this position at least two weeks before sentencing. *See Patriarca*, 4 F.3d at 84; 18 U.S.C. § 3572, as amended by the Violent Crime Enforcement Act of 1994. The government shall have seven days to respond to any memorandum filed by the defendant.

**1.** As described on page 86, footnote 19 of this Memorandum and Order, if Group 5 were given

| | LEVEL | UNITS |
|---|---|---|
| Group 1 Adjusted Offense Level (Act F–I Patriarca's travel between MA and RI in Feb. 1981 as father's messenger, no role adj.) | 6 | 0 |
| Group 2 Adjusted Offense Level (Act F–3 Travel by Carrozza in aid of Extortion, Aug. 1985, +4 role) | 24 | 1 |
| Group 3 Adjusted Offense Level (Act F–8 Gugliemetti's travel from RI to CT Aug. 10, 1989 re: loansharking, +4 role) | 24 | 1 |
| Group 4 Adjusted Offense Level (Act F–10 Travel of Russo pre-October 29, 1989 re: structure, +4 role) | 10 | 0 |
| Group 5 Adjusted Offense Level (Act F–II Travel to induction ceremony Oct. 29, 1989 in aid extortion, +4 role) | 24 | 1 |
| Group 6 Adjusted Offense Level (Caruana extortion, no role) | 22 | 1 |
| Group 7 Adjusted Offense Level (Berns Accessory After First degree Murder, –4 role) | 26 | 1 |
| Total Number of Units | | 5 |

| | |
|---|---|
| Greatest of the Adjusted Offense Levels Above | 26 |
| Increase in the Offense Level as per U.S.S.G. § 3D1.4 | +4 (§ 3D1.4 provides for an increase of 4 levels for 3½–5 units) |
| Combined Adjusted Offense Level | 30 |
| Adjustment for Acceptance of Responsibility: None | 0 |
| Total Offense Level: | 30 |

An Offense Level of 30, together with Criminal History Category I, results in a

a Total Offense Level of 16 (12 plus 4 for the defendant's role) it would add no Units to the Multiple Count Adjustment. *See* U.S.S.G. § 3D1.4. As described on page 57, footnote 11, if Group 6 were given a Total Offense Level of 19 (18 plus 4 for the defendant's role, minus 3 for an unsuccessful attempt), it would add ½ Unit to the Multiple Count Adjustment. *Id.* On this analysis, the defendant would have 3½ Units rather than 5 Units. Section 3D1.4, however, adds 4 Offense Levels for 3½ to 5 Units. Thus, the precise ratings for Groups 5 and 6 are not material.

**634**

guideline sentencing range of 97–121 months. (8 years 1 month–10 years 1 month).